**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 06a0253n.06**
**Filed: April 7, 2006**

**No. 04-2062**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| DWAYNE HUDSON, | ) |
| | ) |
| *Petitioner-Appellant*, | ) |
| | ) On Appeal from the United States |
| v. | ) District Court for the Western |
| | ) District of Michigan |
| MARY BERGHUIS, | ) |
| | ) |
| *Respondent-Appellee*. | ) |

Before: **BOGGS, Chief Judge; BATCHELDER**, **Circuit Judge**; and **WEBER, District Judge**.[*]

**PER CURIAM.**

Petitioner-Appellant Dwayne Hudson appeals a district court judgment denying his petition for writ of habeas corpus. The parties have waived oral argument pursuant to Sixth Circuit Rule 34(j). Upon review, this panel unanimously agrees that oral argument is unnecessary. Fed. R. App. P. 34(a).

**I.**

In denying Hudson's habeas petition, the district court adopted the magistrate judge's report and recommendation, which set forth findings of fact consistent with those of the state appellate court and those restated below.

---

[*]The Honorable Herman J. Weber, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

Hudson was convicted by a jury in the Wayne County Circuit Court of second-degree murder, felonious driving, and operating a motor vehicle while his license was suspended or revoked. On October 12, 2000, the trial court sentenced Hudson to imprisonment of twenty to forty years for the murder conviction, two years for the felonious driving conviction, and up to one year for the operating a motor vehicle with a suspended or revoked license conviction. Hudson later was re-sentenced to imprisonment of fourteen to twenty-five years for the second-degree murder conviction.

The state prosecution arose from an April 27, 1999, car accident in Detroit. A car occupied by Hudson and another black male ran a red light and struck a second car occupied by Thomas and Carole Larimore. Mr. Larimore sustained serious injuries and Mrs. Larimore was killed in the accident. The accident followed police pursuit of the car occupied by the two men. The prosecution conceded that Hudson was in the passenger seat of the car when it first was stopped by police, but maintained that Hudson changed places with the driver sometime between the initial stop by the police and the fatal accident. The defense theory was essentially that Hudson was always the passenger, not the driver of the car that caused the accident.

Thomas Larimore testified that at about 8:00 p.m. on April 27, 1999, he and his wife, Carole Larimore, were driving east on Seven Mile Road toward Berg Road. Mr. Larimore was driving their Crown Victoria and Mrs. Larimore was in the front passenger seat. As Mr. Larimore drove through a green light at the intersection at Seven Mile and Berg, another vehicle ran the light and broadsided the Larimore's car on the passenger side. Just before the impact, Mr. Larimore saw police cars in the intersection. Mr. Larimore began to brake, but it was too late to prevent him from entering the intersection. The vehicle that struck the Larimores was traveling at a high rate of speed and

3

launched them across the intersection into a utility pole. Mr. Larimore did not see the vehicle that struck them. Immediately after the accident, Mr. Larimore could see Mrs. Larimore lying outside the passenger door. Mr. Larimore spent ten days at Grace Hospital, where he was treated for fractured ribs, a bruised heart, a bruised liver, a lacerated spleen, and cuts and bruises. Mrs. Larimore died instantly from multiple injuries sustained in the car accident. The medical examiner described Mrs. Larimore's injuries as "high velocity" or "high impact."

Stephen Rice testified that he was washing his car at a car wash at the corner of Seven Mile and Berg when the collision occurred. When he heard the impact, Rice looked up and saw two cars, airborne, coming toward him. Rice believed that the cars involved were a gray Oldsmobile and a burgundy Crown Victoria. The Oldsmobile landed in the lot of the car wash and the Crown Victoria came to rest in the street by the corner. Rice saw an individual climb out of the passenger window of the Oldsmobile and run eastbound on Seven Mile toward the last bay of the car wash. A short time later, Rice heard the car wash patron in the last bay yelling, "He stole my car, he has my child." Rice could see that there was another person in the Oldsmobile, but did not get a good look at the person because there were several police officers around the car.

Ivan Belew, a Detroit police officer, testified that at about 8:00 p.m. on April 27, 2000, he responded to a call concerning a person with a weapon in Rouge Park. Belew and his partner were driving an unmarked car. The officers turned on their emergency light and siren in an attempt to pull over a four-door sedan that looked like an Oldsmobile or "something like that." Belew got out of his vehicle and approached the passenger side of the car. When he got to the rear door on the passenger side, Belew saw a light-complexioned black male in the front passenger seat of the vehicle, whom he identified as Hudson. Belew saw one other person in the driver's seat, whom he described as a dark-complexioned man wearing a skull cap. Belew saw Hudson throw something

4

that looked like a gun into the glove box. After that, the vehicle sped off.

Officer Belew testified that he and his partner followed the vehicle onto Plymouth Road and then northbound on Evergreen. In order to keep the car in their sight, the officers were traveling 40 to 60 miles per hour in a residential neighborhood with a 25 mph speed limit. After the car turned westbound on Eaton, Officer Belew and his partner were instructed to give up their high-speed pursuit for safety reasons. Up to that point, the officer had never lost sight of the car since the pursuit began. Other units continued to monitor the direction of the car at normal speeds, without the use of lights or sirens. Officer Belew and his partner saw the vehicle three or four minutes later at the intersection of Seven Mile and Berg, after it was involved in the accident. During the interim, the car was out of their sight. Belew and his partner continued through the intersection when they heard over the radio that one of the suspects got into another vehicle.

Two marked police units in the area assisted in monitoring the vehicle after the initial speed pursuit was terminated. Officer Michael Benton testified that he and his partner, Jeremy Rule, observed a car fitting the description given by Officer Belew in the area of Lahser and Five Mile, heading westbound on Five Mile. Benton could see that there were two black males in the car. After the officers saw the car at Lahser and Five Mile, they lost sight of the car for a period of time. The officers did not chase the vehicle, but continued to follow at a distance, maintaining a normal speed in anticipation that the occupants would stop the car and attempt to flee on foot. Because the officers were trying to conceal themselves from the occupants of the car, there were many short periods of time when the officers could not see the car. The officers eventually lost sight of the car and did not see it again until after it was involved in the accident at Berg and Seven Mile. Officer Benton observed Hudson in the driver's seat of the car, trapped behind the steering wheel. Hudson was conscious, but disoriented from the accident. Benton observed a crack in the driver's side of

5

the windshield. The fire department removed Hudson from the car and he was taken to the hospital.

Officer Brian Boykin testified that he and his partner, Jeffrey Williams, observed the suspects' car heading westbound on Grand River. The officers were about four blocks behind the car when it turned north off Grand River onto Berg. Officer Benton's unit was in front of Officer Boykin's unit on Grand River, but turned one block east on Beaverland. Officers Boykin and Williams continued to follow the car north on Berg at a normal rate of speed. The two police units met again at the intersection of Curtis and Berg and Officer Benton's unit proceeded first onto Berg. After the accident, Officer Boykin observed a light-complexioned black male trapped behind the steering wheel.

Police Sergeant Dale Greenleaf and Officer Elmer McFadden testified regarding their investigation of the accident. Both vehicles involved in the accident sustained heavy damage. The driver's door of the gray Buick was crushed so that it would not open, the windshield was heavily damaged, and the dashboard was pushed back and downward toward the driver's seat. McFadden testified that the gray Buick involved in the accident was registered to and insured by Hudson. At the time of the accident, Hudson's driver's license was suspended. McFadden testified that he was unable to obtain the report of the private EMS unit that transported Hudson to the hospital. According to McFadden, Hudson's car was impounded and McFadden had placed a hold on it so that it would not be destroyed, but the car could not be located at the time of trial.

McFadden testified that he requested and obtained a tape of the police radio dispatch during the relevant time period. McFadden did not know how the tape was prepared or whether it had been edited. The prosecutor objected to the admission of the tape on the grounds that the transmissions ran together in a way that could mislead the jury. After listening to the tape outside the presence of the jury, the trial court overruled the prosecutor's objection, but informed the jury that the tape had

6

been edited.  Thereafter, the tape was played for the jury.

After the close of proofs, the defense moved to dismiss on the ground that the prosecutor failed to produce complete and accurate discovery.  Defense counsel specifically argued that the prosecutor failed to (1) provide a complete, unedited transcript or copy of the police dispatch tape; (2) provide a copy of the report of the EMS that transported Hudson to the hospital; and (3) preserve the subject vehicle for inspection.  With regard to the dispatch tape, defense counsel argued that an unedited tape would have shown that there was a continuous chase such that the vehicle was not out of sight long enough for the driver and passenger to change places.  Defense counsel further argued that the EMS report would have indicated Hudson's actual location in the vehicle.  The hospital records refer to EMS bringing in an "unrestrained passenger."  With regard to the vehicle itself, defense counsel argued that Hudson did not have any head injuries that would have been consistent with the damage to the front windshield.  Because the vehicle could not be located at the time of trial, the defense investigator was unable to examine the windshield for blood or other evidence that might show that Hudson was not the driver.  The trial court concluded that there was no due process violation and denied the motion.

At the conclusion of trial on September 15, 2000, the jury found Hudson guilty as charged of second-degree murder, felonious driving, and operating a motor vehicle while license suspended or revoked.

Hudson's direct appeal set forth four issues, including the two later raised in his habeas corpus petition.  The Michigan Court of Appeals remanded his case for re-sentencing on the second-degree murder conviction, but affirmed his convictions.  The Michigan Supreme Court denied Hudson's application for leave to appeal to that court.  The claims preserved and presented for purposes of

7

Hudson's habeas petition[1] are (1) that he was denied his constitutional rights to due process and to a fair trial by the prosecutor's failure to preserve and disclose certain potentially exculpatory evidence that Hudson requested, and (2) that he was denied his constitutional right to a fair trial by the trial court's refusal to provide a requested jury instruction regarding the significance of flight.

**II.**

In reviewing a district court's denial of a petition for a writ of habeas corpus under 28 U.S.C. § 2254, this court considers all legal conclusions *de novo*. *Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir.), *cert. denied*, 543 U.S. 982 (2004). A federal court may grant a habeas corpus petition only when it concludes that the state adjudication of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at" an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). In analyzing a state court decision under that standard, this court "may only look to Supreme Court precedent as of the time of the state court's decision." *Fowler v. Collins*, 253 F.3d 244, 249 (6th Cir. 2001)(citing *Williams*, 529 U.S. at 411).

---

[1]Hudson's final brief identifies his stated issues as violations of both the United States and Michigan constitutions. Federal habeas review, however, is limited to claimed violations "of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). As such, habeas relief is not available for perceived errors of state law, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991), and this court will not address those alleged errors.

**III.**

Hudson's final brief does not challenge in any material respect the findings of fact as stated above, and our *de novo* review confirms that Hudson's conviction was not premised on an unreasonable determination of the facts. Turning our analysis to the legal issues before us, we are persuaded that the district court correctly applied the law as it relates to both issues raised by Hudson's petition.

Regarding his claims stemming from the prosecution's failure to produce potentially exculpatory evidence, Hudson is unable to demonstrate that any such failure constituted a federal constitutional violation. Under existing Supreme Court precedent, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The Supreme Court has identified three components of a true *Brady* violation, as follows: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A "different result" follows, however, when dealing with the failure of a state "to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). Failure to preserve such "potentially useful evidence" does not violate the Due Process Clause "unless a criminal defendant can show bad faith on the part of the police." *Id.* at 58.

Applying this well-established law to the undisputed facts of this case, we conclude that no federal constitutional violation occurred. With respect to the missing EMS report, the record reflects that such evidence would have been prepared by the private EMS which transported Hudson to the hospital, would not have been in the State's possession or control, and thus would have been equally accessible by Hudson directly. As the State of Michigan did not "suppress" such evidence, Hudson cannot establish the second component of a *Brady* violation. *See Strickler*, 527 U.S. at 281-82. Similarly, although Hudson contends that the missing vehicle could have been subjected to testing that might have produced exculpatory evidence suggesting a different driver, Hudson has not shown "bad faith on the part of the police" in failing to produce the car at trial. *See Youngblood*, 488 U.S. at 57-58. The State's failure to preserve that "potentially useful evidence" therefore also does not constitute a federal due process violation. *Id.*

We now turn to the final portion of Hudson's first claim – the absence of a complete, unedited transcript or copy of the police dispatch tape. We again conclude that no federal constitutional violation occurred.

The Michigan court analyzed this claim under the framework set forth in *People v. Lester*, 591 N.W.2d 267 (Mich. App. 1999). *Lester*, in turn, relies on *Brady*. *Id*. at 276. The claim, however, is not a *Brady* claim. Hudson makes no allegation that the prosecutor had access to, but failed to produce, an unedited copy of the dispatch tape; therefore, *Brady* is not implicated. Instead, Hudson complains of the police department's failure to preserve an unedited copy. As a result, his claim must be analyzed under *Youngblood*.

Under *Youngblood*, Hudson must show that the police acted in bad faith by failing to preserve the unedited tape. 488 U.S. at 58. Hudson has not borne his burden. The record does not reflect who edited the tape, how it was edited, or why it was edited. In fact, the record contains no definitive statement by any witness that the tape was edited at all. Rather, the parties rely on the state trial court's observation that "it's obvious to the court, from the whirling sounds that are representative in the tape, that the tape has in fact been edited." This statement alone is not sufficient to satisfy Hudson's evidentiary burden. Because Hudson has not shown bad faith on the part of the police, we cannot grant him relief on the basis of the state trial court's admission of the tape.

Furthermore, Hudson has not demonstrated prejudice as a result of the tape's admission, and, therefore, even if we viewed this claim as a *Brady* claim, we would find it without merit. Significantly, it was the prosecution rather than the defense that opposed the introduction of the tape at trial, arguing that the shortened time frame represented on an edited tape would create the impression that Hudson had less opportunity than what actually transpired to move from the passenger's seat to the driver's seat. In light of the possibility that the tape, if edited, created an impression more favorable to Hudson than an unedited version would have, it remains arguable whether an unedited tape would have had any exculpatory value. Even assuming that an unedited tape might have had some exculpatory effect, however, we do not find it reasonably probable that "the result of the proceeding would have been different" had the State produced such a tape. *See Strickler*, 527 U.S. at 280. The jury heard testimony that Hudson originally was seen in the passenger seat, and that the vehicle was observed or monitored by police for most of the few minutes that elapsed between that observation and the fatal accident. Even an unedited version of the tape that confirmed the short time span would have been cumulative of testimony already presented, in contrast to evidence that Hudson was found wedged behind the steering wheel after the accident,

while the other occupant was able to flee through the passenger window. Absent prejudice, Hudson cannot establish a *Brady* violation.

Hudson likewise is unable to demonstrate any federal constitutional violation arising from the trial court's failure to give the requested jury instruction on flight. A claim that a trial court failed to give a jury instruction is not cognizable on federal habeas review unless the omission "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 156-57 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). The record demonstrates that although the trial judge declined to give the requested instruction, the jury nonetheless heard testimony about how the vehicle's second occupant fled from the scene following the accident. Hudson's trial counsel also argued to the jury that such flight indicated that individual's guilt as the driver of the vehicle. Even the instruction requested by Hudson would have given the jury equivocal guidance at best, suggesting only that flight could be the product of "panic, mistake, or fear," or "consciousness of guilt." Because the jury was permitted to consider both evidence and argument supporting the defense theory that the fleeing occupant had been the driver of the car, the possibility that the jury could have reached a different verdict if a flight instruction also had been give is "too speculative to justify the conclusion that constitutional error was committed." *Henderson*, 431 U.S. at 157.

We therefore affirm the district court judgment denying Hudson's petition for writ of habeas corpus.