RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0110p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROBERT CARL FOLEY,

> *Petitioner-Appellant,*

v.

No. 04-5746

PHILIP PARKER, Warden, Kentucky State
Penitentiary,

> *Respondent-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 00-00552—Danny C. Reeves, District Judge.

Argued: October 25, 2006

Decided and Filed: March 22, 2007

Before: MARTIN, GILMAN, and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** Timothy T. Riddell, PERCH & TOBY, Lexington, Kentucky, for Appellant. David A. Smith, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Timothy T. Riddell, PERCH & TOBY, Lexington, Kentucky, Milton Coburn Toby, Georgetown, Kentucky, for Appellant. David A. Smith, Tami Allen Stetler, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

COOK, J., delivered the opinion of the court in which, GILMAN, J., joined. MARTIN, J. (pp. 13-19), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

COOK, Circuit Judge. Petitioner Robert Carl Foley was convicted of murder in Kentucky and sentenced to death. After a lengthy appellate process in the Kentucky courts, Foley filed a habeas petition raising thirty-six separate grounds for relief. The district court reviewed and denied each one, but granted a Certificate of Appealability (COA) as to four of Foley's claims. Upon Foley's request, we expanded the COA to include a fifth claim. For the reasons set forth below, we affirm the district court's judgment.

**I. Background**

Robert Carl Foley shot and killed the brothers Rodney and Lynn Vaughn in Foley's home in Laurel County, Kentucky, on August 17, 1991. A number of people, including the Vaughn brothers, Phoebe Watts, Ronnie and Bill Dugger, Rocky and Lisa Arthur, Marge Foley (petitioner's wife), Louise Bridges (Foley's aunt), and at least six children, were gathered at the Foley home when Foley returned from a car auction with his friend Danny Joe Bryant. Although the other men present had stored their guns in a kitchen cabinet upon arrival, Foley kept a .38 Colt snubnose revolver stored under his belt and concealed by his shirt.

The group sat at the kitchen table drinking beer, and tempers soon flared between Foley and Rodney Vaughn, who was intoxicated and belligerent. Foley admitted he instigated a fight by punching Rodney. After a brief scuffle, Danny Joe Bryant separated the men, and they returned to the table to continue drinking. The situation escalated, however, when Rodney pointed at Foley and warned Foley not to sucker-punch him again. Foley responded violently, knocking Rodney down with his fist several times. Foley then drew his revolver and shot Rodney six times at close range, in the chest, left arm, and back.

The house emptied during the melee, leaving only Foley, the Vaughn brothers, and Ronnie Dugger in the house. As the only living witness (other than Foley) to what happened next, Ronnie Dugger explained that Foley retrieved another gun from the kitchen cabinet, returned to the living room where Lynn Vaughn remained next to his dying brother, and shot Lynn in the back of the head. He then kicked Rodney Vaughn's corpse, saying "you son of a bitch, you caused me to have to kill my partner." Later, Foley explained that he hated to kill Lynn, "but blood is thicker than water."

Foley then organized Ronnie Dugger, Bill Dugger, and Danny Joe Bryant to assist him in disposing the bodies and covering up the crimes. They dumped the Vaughn brothers' bodies in Sinking Creek in Laurel County and attempted to cover up the incident and cast blame on other people. Authorities discovered the bodies two days later and indicted Foley on two counts of capital murder and other related offenses. Foley was later charged with four more murders after police discovered four corpses in a septic tank in Laurel County.

Foley's trial for the Vaughn murders was scheduled for August 11, 1993. On the eve of trial, August 10, 1993, Foley's attorney moved for a change of venue because of pretrial publicity, which the trial court denied after a hearing. The jury found Foley guilty of two counts of murder and, following the jury's recommendation, the trial court sentenced Foley to death. The Kentucky Supreme Court affirmed the convictions and sentences in November 1996, and the United States Supreme Court denied certiorari in 1997. *Foley v. Commonwealth*, 942 S.W.2d 876 (Ky. 1996), *cert. denied*, 522 U.S. 893 (1997). Foley filed a post-conviction petition pursuant to Ky. R. Crim. P. 11.42, but the trial court denied relief. The Kentucky Supreme Court affirmed that decision in March 2000. *Foley v. Commonwealth.*, 17 S.W.3d 878 (Ky.), *cert. denied*, 531 U.S. 1055 (2000). Foley then moved for a new trial, but the trial court denied the motion, and the Kentucky Supreme Court affirmed. *Foley v. Commonwealth*, No. 2002-SC-0222-TG, 2003 WL 21993756, at *1 (Ky. Aug. 21, 2003).

While the state proceedings pended, Foley moved for a stay of execution in the district court and later filed his petition for a writ of habeas corpus. The district court granted Foley leave to amend his petition to include the claim that formed the basis of his state-court motion for a new trial. The magistrate judge reviewed Foley's petition, the Warden's response, and subsequent pleadings. The magistrate judge recommended that the petition be denied and that a COA be granted with respect to the merits of three claims and the timeliness of the claim Foley added by amendment. Foley filed objections, and the Warden gave notice that he was not going to respond to Foley's

objections.  The district court adopted the magistrate judge's report in part and rejected it in part. The district court denied the petition and granted Foley a COA with respect to four claims, including both the timeliness and the merits of the claim added by amendment.  Foley applied to this court for an expansion of the COA, which we granted by adding a fifth claim.

## II. Standard of Review

We review de novo a district court's legal conclusions and mixed questions of law and fact, and we review its factual findings for clear error. *Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir. 2004); *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999).  Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court shall not grant a habeas petition with respect to any claim that was adjudicated on the merits in the state courts unless the adjudication resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts.  28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from the Supreme Court's decisions but unreasonably applies it to the facts of the petitioner's case.  *Id.* In analyzing whether a state court decision is "contrary to" or an "unreasonable application" of clearly established Supreme Court precedent, a federal court may only look to the holdings of the Supreme Court's decisions as of the time of the relevant state-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, 529 U.S. at 412.  The court may look to lower courts of appeals' decisions, not as binding precedent, but rather to inform the analysis of Supreme Court holdings to determine whether a legal principle had been clearly established by the Supreme Court. *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003).  Finally, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings were correct.  *See* 28 U.S.C. § 2254(e)(1); *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004).

## III. Ineffective Assistance of Counsel During the Penalty Phase of Foley's Trial

Foley claims he was denied effective assistance of counsel because his trial counsel failed to fully investigate his background and did not produce any mitigating evidence during the penalty phase of his trial.  He contends that his counsel should have called six family members, five friends, and a school teacher who had not seen him since the 1970s to testify on his behalf.    Following a detailed hearing in the Kentucky trial court pursuant to Ky. R. Crim. P. 11.42, the Kentucky Supreme Court reviewed this claim and denied it.  The magistrate judge reviewed the Rule 11.42 hearing record and the Kentucky Supreme Court's decision, concluding that Foley's claim should be denied because the Kentucky Supreme Court's conclusion was neither contrary to nor an unreasonable application of clearly established federal law.  The district court agreed and denied Foley's claim.

### *Strickland v. Washington* and AEDPA

AEDPA limits our inquiry to assessing whether the Kentucky Supreme Court's conclusion that Foley could not show either deficient performance or prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984), was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court at the time the Kentucky Supreme Court issued its June 15, 2000, decision reviewing his claim.  Thus, despite Foley's protestations, our review will ignore interpretations of *Strickland* by the Supreme Court in cases such as *Rompilla v. Beard*, 545

U.S. 374 (2005), and *Wiggins v. Smith*, 539 U.S. 510 (2003), which were decided after the Kentucky Supreme Court's adjudication of Foley's claim. Foley's reliance on our court's interpretations of *Strickland* in cases such as *Harries v. Bell*, 417 F.3d 631 (6th Cir. 2005), and *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003), is similarly misplaced. Our sole question with respect to this claim, then, is whether the Kentucky Supreme Court's *Strickland* application was unreasonable. We hold that it was not.

To prevail on an ineffective-assistance claim, a petitioner must satisfy both the performance and prejudice prongs of the *Strickland* test. 466 U.S. at 688, 692. To satisfy the performance prong, a petitioner must prove that his counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. As the *Strickland* Court cautioned, our post-hoc review of

> counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

*Id.* at 689. The defendant's burden requires him to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (citation omitted).

To satisfy *Strickland*'s prejudice prong, a petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "When a [petitioner] challenges a death sentence . . . , the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.

**Performance**

As the only "clearly established federal law" relevant to Foley's appeal, we look to *Strickland* to gauge Foley's claims. *Strickland* instructs that we assess the reasonableness of counsel's decision to limit his investigation: "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. The defendant's role in informing counsel and influencing decisions must be taken into account. As *Strickland* explained,

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Id.* at 691.

Here, Foley played an active role in influencing counsel's decisions, and Foley himself limited the evidence counsel could put on in mitigation because he did not want his family to testify on his behalf. Foley made this decision despite several attempts by counsel to discuss "what evidence we were going to put on in mitigation." Foley participated in his own defense throughout the trial, maintaining his own "file" on his case, and counsel's decision to follow his client's wishes was reasonable. Counsel was quite familiar with Foley. He had represented Foley in an earlier murder trial and was well-acquainted with Foley, his family, and his background, and thus had reason to limit his investigation into Foley's past. Moreover, as we explain below, the testimony that Foley asserts his attorney should have introduced in mitigation had limited value and likely would have damaged Foley further in the eyes of the jury.

**Prejudice**

Foley's claim ultimately must fail, however, because Foley is not able to establish a reasonable probability that the jury would have decided not to sentence him to death if it had heard the testimony that he argues should have been presented. *See Strickland*, 466 U.S. at 695. Some of the testimony could be considered mitigating, in that it described Foley in positive terms: nice, giving, loving, sweet, a good family man, and a hard worker. Much of the evidence, though, was either not mitigating or distinctly negative. Several witnesses mentioned Foley's penchant for violence, a description difficult to reconcile with the positive accounts but consistent with the crimes the jury knew Foley had committed. Notably, Foley has never come forward with evidence of a difficult childhood or mental problems that might have portrayed him in a more sympathetic light. Although family members testified that Foley had suffered head injuries, there were no medical records to substantiate these claims or to prove that Foley was mentally impaired at the time of his crimes.

A survey of our previous cases bolsters our view that the Kentucky Supreme Court's conclusion that Foley cannot establish prejudice was correct. *See Abdur'Rahman v. Bell*, 226 F.3d 696, 708-09 (6th Cir. 2000) (finding deficient performance but not prejudice where counsel failed to investigate petitioner's long history of violent behavior and antisocial personality disorders and where the evidence contained a description of petitioner's motive for killing a fellow prison inmate and a history of violent character traits); *Scott v. Mitchell*, 209 F.3d 854, 880-81 (6th Cir. 2000) (finding no prejudice where the mitigating circumstances petitioner wanted presented—loyalty to his siblings, girlfriend, and children, and a violent environment throughout his upbringing—would have been negated by evidence of his history of robbery, assault, kidnaping, and other violent acts).

In addition, although our review is limited to assessing the Kentucky Supreme Court's decision under the strictures of AEDPA, we note the telling contrasts between this case and those in which this court has granted relief. *See, e.g.*, *Harries*, 417 F.3d at 639-40 (counsel's inadequate investigation failed to discover evidence of traumatic childhood, including physical abuse, exposure to extreme violence, brain damage, and mental illness); *Hamblin*, 354 F.3d at 490-91 (counsel conducted no investigation into mitigation, which included evidence of unstable and deprived childhood and probable mental disability or disorder); *Coleman v. Mitchell*, 268 F.3d 417, 450-52 (6th Cir. 2001) (defendant was abandoned by his mother and raised by his grandmother, who abused him both physically and psychologically, neglected him while running her home as a brothel and gambling house, involved him in her voodoo practice, and exposed him to group sex, bestiality, and pedophilia); *Carter v. Bell*, 218 F.3d 581, 594-600 (6th Cir. 2000) (counsel deficient for failing to investigate and present mitigating evidence of petitioner's poor, violent, and unstable childhood, childhood and adult head injuries, psychiatric problems, and positive relationships with his step-children, family, and friends); *Skaggs v. Parker*, 235 F.3d 261, 269-75 (6th Cir. 2000) (post-conviction evidence indicated that Skaggs was mentally retarded, suffered from organic brain damage, and exhibited psychotic, paranoid, and schizophrenic features).

Accordingly, we conclude that the Kentucky Supreme Court's decision to deny Foley's ineffective-assistance claim was not contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court.

## IV. Rebuttal Evidence

Foley complains that the prosecution elicited substantive proof of his guilt during its rebuttal, in violation of Kentucky's rule that substantive proof of guilt should be presented during the prosecution's case in chief. *Wager v. Commonwealth*, 751 S.W.2d 28, 29 (Ky. 1988). He raised this claim on direct appeal, and the Kentucky Supreme Court dismissed it summarily, noting "that there was no error of sufficient gravity to warrant reversal of his conviction." *Foley*, 942 S.W.2d at 890. Foley faces significant hurdles in challenging this conclusion here. First, "a federal court may not issue [a writ of habeas corpus] on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). A trial judge's decision concerning the admission of evidence is a state-law matter generally not subject to habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Evidentiary issues are not a sufficient basis for granting habeas corpus relief unless the alleged errors deny the petitioner a fair trial. *Clemmons v. Sowders*, 34 F.3d 352, 357-58 (6th Cir. 1994).

We conclude that the admission of the rebuttal evidence did not deny Foley a fair trial. A survey of the evidence makes this clear. During the prosecution's case in chief, three witnesses testified that they saw Foley shoot Rodney Vaughn: Ronnie Dugger, Bill Dugger, and Danny Joe Bryant. Phoebe Watts testified that she began fleeing the house when she saw Foley draw his pistol and heard shots as she left. Ronnie Dugger was the only witness who testified that he saw Foley shoot Lynn Vaughn. Foley admitted carrying a pistol the night of the killings and admitted shooting Rodney Vaughn. According to Foley, Rodney was armed and Foley shot him to protect himself and Lynn Vaughn. Foley also testified that Ronnie Dugger shot Lynn Vaughn. In rebuttal, Bryant and Dugger testified that, after shooting the Vaughns, Foley kicked Rodney Vaughn and said, "you son of a bitch, you caused me to have to kill my partner [Lynn Vaughn]." Caldwell testified that Foley tried both to get Caldwell to lie for him by testifying that he saw Danny Joe Bryant shoot Lynn Vaughn and to convince Ronnie Dugger to go along with this statement.

The only substantive evidence of Foley's guilt that came in on rebuttal was Foley's admission in the presence of Bryant and Ronnie Dugger that he shot Lynn Vaughn. During the prosecution's case in chief, the jury had heard four witnesses testify that Foley was the only one at the gathering who was armed. (Louise Bridges testified that Rodney Vaughn also had a gun.) Ronnie Dugger had already testified that he saw Foley shoot Lynn. Moreover, Ronnie Dugger's pre-trial deposition, taken in May 1993, undercuts Foley's claim that he was "sandbagged" by this evidence. When asked at his deposition if Foley said anything about the shootings, Ronnie Dugger testified that Foley said he hated to shoot his partner. Thus, Foley should not have been surprised by Ronnie Dugger's rebuttal testimony. Finally, Caldwell's testimony that Foley tried to get him to lie for Foley was merely cumulative of several witnesses' testimony that Foley orchestrated the disposal of the victims' bodies. In sum, the rebuttal testimony did not render Foley's trial unfair and does not entitle Foley to habeas relief.

## V. Change of Venue/Continuance

Foley argues that the trial court violated his rights to a fair trial, an impartial jury, and due process of law when it denied his motion for a change of venue or a continuance. He alleges that because of pretrial publicity, the overwhelming majority of prospective jurors knew about the case before coming to court, over thirty percent had already formed an opinion that Foley was guilty and at least one such person sat on the jury, and prospective jurors knew about the four other murder charges pending against Foley. As an alternative to a change of venue, Foley requested a continuance so the publicity could abate over time.

In support of his motion for a change of venue, Foley filed over 200 pages of exhibits and affidavits, including articles from two statewide newspapers and four regional papers dated from August 23, 1991, to August 13, 1993. The first articles reported Foley's arrest for the Vaughn murders. The Laurel County District Court entered an order on August 23, 1991, prohibiting law enforcement and court personnel from disclosing information about the case. Other articles published in the fall of 1991 provided additional information about Foley, including his status as an FBI informant and the fact that this status kept him from being jailed on charges pending in Ohio at the time of the Vaughn killings. Articles stated that Foley was linked to earlier assaults and deaths.

In October 1991, authorities recovered four bodies from property in the Bald Rock community of Laurel County, Kentucky. The bodies were covered in lime and placed in a septic tank, and the tank was capped with cement. Several newspaper stories linked Foley to these murders. In different articles, the Lexington Herald-Leader gave witnesses' accounts of both the Vaughn killings and the septic tank murders and asserted that Foley was linked to a total of nine killings. Additional stories followed in November 1991. The Laurel County Circuit Court extended the earlier gag order to the septic tank case by order entered November 8, 1991.

Press coverage subsided until the fall of 1992. Several papers carried a story about a search for a fifth victim at the Bald Rock site and the discovery of two leg bones evidently planted as a hoax. The articles mentioned Foley and the Vaughn case. In January 1993, newspapers reported that a date was set for trial in the Vaughn case. That same month, reporters covered a civil lawsuit filed by members of the Vaughn family against the FBI. That case also appeared in the news in May 1993. In late May 1993, the London Sentinel-Echo reported on the deposition testimony of several witnesses in the two cases against Foley. The same paper published excerpts from the depositions on August 13, 1993. The trial court had ordered that the depositions remain under seal.

In response to Foley's motion, the Commonwealth argued that the newspapers had low circulation in Laurel County and that the articles mostly dated from 1991. The prosecution submitted circulation figures for the papers and estimated that less than half of the potential jury pool was exposed to the stories. (Foley was tried for the septic tank murders in April 1994. The trial court granted a change of venue, and the trial was held in Madison County, Kentucky. *Foley v. Commonwealth*, 953 S.W.2d 924, 928 (Ky. 1997).)

**State Court Decision**

The Kentucky Supreme Court affirmed the trial court's decision to deny a change of venue by a four-to-three vote. The court noted that Foley did not request a change of venue until the day before trial was scheduled to begin, that most of the newspaper articles he cited were from 1991, two years before the trial, and concluded that the articles were not so numerous or inflammatory as to render Foley's trial unfair. *Foley*, 942 S.W.2d at 880-81. The Kentucky Supreme Court found that most jurors heard little more than what was in the indictment and concluded that the jurors who served had not formed an opinion regarding Foley's guilt or innocence. The court cited *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991), for the proposition that the trial judge has a great deal of discretion when assessing pretrial publicity and juror contamination. *Foley*, 942 S.W.2d at 884. Three justices in dissent found that the trial court erred when it failed to grant a change of venue and that the ten challenged jurors were biased against Foley. *Id.* at 890-92 (Stumbo, J., dissenting). The dissent emphasized the number of prospective and actual jurors who knew about Foley and the crimes charged, their responses in voir dire, and what it termed the comprehensive and repetitive newspaper coverage. *Id.* at 890-91.

**District Court Decision**

The district court held that the Kentucky Supreme Court's decision was not unreasonable given the jurors' attestation that they could remain impartial, the fact that publicity had abated by the time of trial, and that the jurors had little knowledge of the case and testified that any outside knowledge would not affect their deliberations. The district court acknowledged that fifteen to twenty minutes was a short amount of time to reach a verdict, but found that there was overwhelming evidence of guilt. The court reiterated that all of the jurors selected for the trial affirmed that they could be fair and impartial and concluded that the Kentucky Supreme Court's analysis was neither contrary to nor an unreasonable application of Supreme Court precedent.

**Analysis**

We conclude that the district court properly denied this claim. If pretrial publicity jeopardizes a defendant's right to a fair trial by an impartial jury, the trial court should grant the defendant a change in venue. *Irvin v. Dowd*, 366 U.S. 717, 722-24 (1961); *Ritchie v. Rogers*, 313 F.3d 948, 956 (6th Cir. 2002). Prejudice resulting from pretrial publicity can be presumptive or actual. *Nevers v. Killinger*, 169 F.3d 352, 362 (6th Cir. 1999), *abrogated on other grounds*, *Harris v. Stovall*, 212 F.3d 940, 942-43 (6th Cir. 2000). Presumptive prejudice from pretrial publicity occurs where an inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community. *Ritchie*, 313 F.3d at 952-53; *Gall v. Parker*, 231 F.3d 265, 309 (6th Cir. 2000). Prejudice from pretrial publicity is rarely presumed. *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998).

Where pretrial publicity cannot be presumed prejudicial, the trial court must then determine whether it rises to the level of actual prejudice. *Ritchie*, 313 F.3d at 962. The primary tool for discerning actual prejudice is a searching voir dire of prospective jurors. *Id*. The court must review the media coverage and the substance of the jurors' statements at voir dire to determine whether a community-wide sentiment exists against the defendant. *Nevers*, 169 F.3d at 366. Negative media coverage by itself is insufficient to establish actual prejudice, and the existence of a juror's preconceived notion as to the guilt or innocence of the defendant, without more, is not sufficient to rebut the presumption of impartiality. *Id.* at 366-67. "[M]ere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint . . . ." *DeLisle*, 161 F.3d at 382. The prospective juror must be able to lay aside his or her impressions or opinions and render a verdict based upon the evidence presented in court. *Irvin*, 366 U.S. at 723; *Ritchie*, 313 F.3d at 962. The relevant question is "did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036 (1984).

The state court decision concerning venue was neither contrary to nor an unreasonable application of federal law as determined by the United States Supreme Court. First, it is clear that the pretrial publicity in this case does not merit a presumption of prejudice. Although there was significant media attention when Foley was arrested, when the bodies were discovered in the septic tank, and when there were significant developments in the case, this was not one of the rare cases tried in a circus-like atmosphere. There is nothing in the record to suggest any contact between the media and the jury during the trial. *See Ritchie*, 313 F.3d at 952-53.

Second, our review of the voir dire does not support the conclusion that pretrial publicity resulted in actual prejudice. *See id.* at 962. There was publicity surrounding both the Vaughn murders and the discovery of the four bodies in the septic tank, and many articles linked Foley to these and earlier crimes. By the time of the trial, however, nearly two years had elapsed since most of the articles appeared. The potential jurors' responses in voir dire reflected this passage of time.

Most knew that Foley was accused of killing the Vaughns, a smaller number knew that he was suspected of killing the four people found in the septic tank, and a still smaller number knew details about Foley and both crimes from news accounts.

To quantify the voir dire responses, six of the ninety-eight prospective jurors had heard nothing of the case; eighteen were excused because they had the opinion that Foley was guilty; seventeen were excused because, given what they had read or heard about the case, they could not presume Foley innocent; six were excused because of personal knowledge of the case; nine were excused for bias due to connections with law enforcement or the victims; seven were excused for opposing the death penalty; one was excused because he would not consider a penalty other than death if Foley were convicted; and five were excused for miscellaneous reasons. *Foley*, 942 S.W.2d at 881. Of the twelve jurors who actually rendered the verdict, two had no prior knowledge of the case, six were aware that Foley was implicated in the Vaughn killings and the septic tank case, and the remaining four knew about the Vaughn killings but not the septic tank case.

The Kentucky Supreme Court did not address directly whether the jurors who were not excused swore that they could set aside any opinion they might hold and decide the case on the evidence. The court analyzed the issue under its own precedent and described the voir dire responses of the ten challenged jurors. *See id.* at 882-84 & nn.2-11. Foley's brief has conceded the accuracy of the Kentucky Supreme Court's descriptions of the responses of those jurors. Juror A convinced the trial court that she would do her best to base her verdict solely on the evidence presented in court, Juror B stated that the massive publicity would not affect his rendering a fair and impartial verdict, Juror C had no opinion as to Foley's guilt, Juror D (the alternate) said that he would enter jury deliberations feeling that Foley was not guilty and that the prosecution had the burden of proof, Juror E said he had no opinion of guilt without hearing all the facts, Juror F said he could be an impartial juror and understood the burden of proof, Juror G said she was not sure if she could remove all information from her mind during the trial and deliberations, but the trial court was convinced that she would follow instructions and decide the case only on the evidence presented, Juror H said she had no ill feelings toward Foley and could put aside all news reports, Juror I had no problem presuming Foley's innocence and putting the publicity out of her mind, and Juror J (the foreman) said that the media had not swayed his opinion and he had formed no impressions of Foley. *See id.*

Thus, all of the ten challenged jurors expressed the view, variously phrased, that they could set aside what they had heard about the case and decide it based upon the evidence presented in court. *See Patton*, 467 U.S. at 1036. The remaining question is, in view of the pretrial publicity, should the jurors' statements of impartiality be believed. "In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it." *Murphy v. Florida*, 421 U.S. 794, 803 (1975). In this case, forty-four of the ninety-eight prospective jurors were disqualified because of opinion of guilt, knowledge of the case, or bias in favor of the prosecution. *Foley*, 942 S.W.2d at 881. In *Murphy*, the Supreme Court determined that the fact that twenty of the seventy-eight persons questioned were excused because they indicated an opinion as to petitioner's guilt did not impeach the impartiality of the jurors who did not express an opinion as to guilt. *Murphy*, 421 U.S. at 803; *see also Mu'Min*, 500 U.S. at 417 (although eight of the twelve jurors empaneled were aware of news reports about the defendant, all of the jurors empaneled stated that they could be impartial). Accordingly, we hold that the Kentucky Supreme Court's decision that pretrial publicity did not require a change of venue because of actual prejudice was neither contrary to nor an unreasonable application of federal law as determined by the United States Supreme Court.

The district court also properly denied Foley's claim that the trial court should have granted him a continuance to let publicity die down. Denial of a continuance rises to the level of a

constitutional violation only if it is so arbitrary as to violate due process. *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983). The petitioner must also demonstrate that the denial of a continuance actually prejudiced his or her defense. *Burton v. Renico*, 391 F.3d 764, 772 (6th Cir. 2004); *Powell*, 332 F.3d at 396. The Kentucky Supreme Court found that the trial court was justified in denying Foley's motion for a continuance because he filed it on the eve of trial. Thus, the denial was not arbitrary. Moreover, Foley cannot show prejudice because, as stated above, he did not demonstrate that it was impossible to seat an impartial jury in Laurel County in the fall of 1993.

### VI. Trial Court's Refusal to Strike Ten Jurors for Cause

Foley argues that the trial court erred by failing to strike ten jurors he challenged for cause. He maintains that the court should not have accepted the jurors' statements that they could be impartial and judge the case only on the facts presented. Foley points to the speed of the jury's verdict as compelling the conclusion that the jurors had prior knowledge of the case and, in some instances, knowledge of the accusations against Foley in the quadruple-homicide case.

**State Court Decision**

The Kentucky Supreme Court, in a four-to-three decision, affirmed the trial court's decision regarding the ten challenged jurors. The court reviewed each juror's responses in voir dire to examine their pretrial knowledge of other crimes connected to Foley, their ability to put such knowledge out of their minds, and their ability to presume Foley innocent. As summarized above, the Kentucky Supreme Court determined that each of the challenged jurors stated that he could set aside what he knew about the case and decide it only on the evidence presented at trial. *Foley*, 942 S.W.2d at 882-84 & nn.2-11. The court concluded that the jurors' recollections diminished with time, that most remembered few details, that none who served indicated that he had formed an opinion regarding guilt or that the information affected his ability to render a verdict based on the evidence presented, and that the jurors who might have been influenced by the pretrial publicity were excused by the trial court. The court found that most of the press coverage merely mentioned the facts of the case, that most of the articles were in papers that had little distribution in Laurel County, and that while most jurors remembered hearing of the case they could not recall details. *Id.* at 882-85.

Justice Stumbo, writing for the dissent, noted that each of the ten challenged jurors knew who Foley was and knew of the crime charged, that six of the ten knew of the other murders with which Foley was charged, and that extensive rehabilitation was necessary in order to qualify the jurors for service on the jury. *Id.* at 891 (Stumbo, J., dissenting). In addition, the dissent identified responses by six of the jurors that suggested they believed, or knew people who believed, that Foley was guilty. *Id.* Finally, the dissent asserted that the jurors' knowledge of the media coverage and facts surrounding this case and the other charges against Foley meant that it was reasonable to infer actual bias or prejudice. *Id.* at 891-92.

**District Court Decision**

The magistrate judge observed that the trial court conducted a lengthy voir dire over three days and that all ten challenged jurors questioned about whether they could be impartial and consider the full range of penalties. The magistrate judge reviewed the voir dire of each of the ten jurors and noted that they had only very limited knowledge of the events reported in the media, that this information was not probative of guilt, and that they did not learn the information from anyone associated with the case. In addition, the magistrate judge found that the jurors' responses did not reflect any preconceived opinions of guilt or hostility toward Foley. Finally, the magistrate judge concluded that Foley had not rebutted the state courts' factual findings and that the Kentucky

Supreme Court's decision was neither contrary to nor an unreasonable application of Supreme Court precedent.

The district court overruled Foley's objections to the magistrate judge's report and recommendation. The court distinguished the case relied upon by Foley, *Wolfe v. Brigano*, 232 F.3d 499 (6th Cir. 2000). In *Wolfe*, two jurors knew the victim's parents well and did not state unequivocally that they could set aside their relationships with the victim's parents and decide the case fairly. *Id.* at 502. In this case, the district court found no evidence of a significant risk that any of the jurors in Foley's case might be partial despite attestations to the contrary.

**Analysis**

As explained above in our discussion about pretrial publicity, prior knowledge of the case or even an opinion on the merits is not enough to disqualify a juror who swears that he can set aside any opinion and decide the case upon the evidence presented at trial, and the juror's protestation of impartiality is to be believed. *See Patton*, 467 U.S. at 1035; *Irvin*, 366 U.S. at 723. In this case, the trial court conducted a thorough voir dire and was satisfied from the responses of the ten challenged jurors that they could set aside what they had heard about the case and decide it based upon the evidence presented in court. *See Patton*, 467 U.S. at 1036. Foley conceded the accuracy of the Kentucky Supreme Court's summary of the jurors' responses and has not shown that the state court's decision regarding those jurors was contrary to or an unreasonable application of federal law as determined by the Supreme Court.

### VII. The Commonwealth's Use of Aaron Caldwell's Testimony

Foley argues that the Commonwealth attempted to bolster its case by using perjurious testimony from Caldwell that Foley tried to get Caldwell to lie for him. During the prosecution's rebuttal, Caldwell testified that Foley wanted Caldwell to say that he saw Danny Joe Bryant shoot Lynn Vaughn and wanted Caldwell to convince Ronnie Dugger to go along with this statement.

In a June 2001 motion for a new trial, Foley alleged that Caldwell had perjured himself at trial. He attached an affidavit by Caldwell, also known as Aaron Rivers, dated March 17, 2000, in which Caldwell swore that Foley had not asked him to lie, that Ronnie Dugger told him Rodney Vaughn killed Lynn Vaughn, that Caldwell said what the Kentucky State Police wanted to hear, and that the prosecutor coached him on his testimony. While Foley's motion for a new trial pended, Caldwell executed another affidavit. In this affidavit, dated June 8, 2001, Caldwell swore that Ronnie Dugger's sister paid him $8000 to corroborate Dugger's testimony at trial, that the prosecutor did not coach him about what to say at trial, that he completed the earlier affidavit and reported falsely that Foley coerced him to do so in order to be transferred from a maximum to a minimum security prison, and that he had lied so many times in this case to benefit himself it was hard to keep up.

The Commonwealth objected to Foley's motion and attached an October 2001 affidavit from Caldwell, an April 2000 affidavit from Caldwell, and letters Caldwell wrote to Commonwealth Attorney Tom Handy and Kentucky Department of Public Advocacy Investigator Cathy Bowman. The letters to Handy stated that Caldwell feared Foley would kill him or have him killed in prison. An undated letter to Bowman wondered why the prosecution allowed him to take the stand against anyone, especially in a murder case. The April 2000 affidavit recited that Caldwell signed the March 2000 affidavit in response to a threat on his life by Foley. Caldwell's October 2001 affidavit disavowed the letters and vouched for the June 2001 affidavit.

**State Court Decision**

The trial court found that Foley had failed to show that Caldwell's trial testimony was false, that the prosecutor knew it was false, or that the absence of Caldwell's testimony would have changed the jury's verdict. The Kentucky Supreme Court agreed with each conclusion. *Foley*, 2003 WL 21993756, at *2-3. The court noted that Caldwell had signed conflicting affidavits several years after the trial and while serving time in the same prison system as Foley, leaving no reason to believe that they were any more reliable than his initial testimony. As to the prosecution's knowledge of Caldwell's alleged perjury, the court found that Foley could not show that the prosecutor could have known that Caldwell would recant his trial testimony six or seven years later. Finally, the court held that there was not a reasonable likelihood that Caldwell's testimony affected the judgment of the jury because there was overwhelming testimony as to Foley's guilt and his attempts to orchestrate a cover-up.

**District Court Decision**

The magistrate judge concluded that the Kentucky Supreme Court reasonably applied *Giglio v. United States*, 405 U.S. 150 (1972), to the facts of the case and that the state court's decision was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. The district court detailed the state courts' findings and conclusions and agreed with the magistrate judge. The district court found the Kentucky Supreme Court's conclusions on the relevant factual issues entitled to deference and a presumption of correctness under 28 U.S.C. § 2254 and concluded that the state court's opinion was not contrary to any Supreme Court precedent. The court reiterated that the prosecution was not aware that Caldwell committed perjury at trial and that Foley could not demonstrate that, absent Caldwell's testimony, the outcome of the trial might have been different because there was overwhelming evidence of Foley's guilt and his attempts to intimidate witnesses and shift blame.

**Analysis**

We conclude that the district court properly denied this claim. The knowing use of perjured testimony, including the failure to correct false testimony, constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Napue v. Illinois*, 360 U.S. 264, 272 (1959). This includes the use of testimony, whether elicited or left uncorrected, that the prosecutor knows or should know is false. *Giglio*, 405 U.S. at 153-54. In this case, Foley has not shown that the prosecution knew or should have known that Caldwell was committing perjury when he testified at Foley's trial. None of Caldwell's post-judgment statements that support Foley date to the time of the trial. Moreover, the accumulation of contradictory statements Caldwell has made over the years provides no basis to conclude that Caldwell lied at trial, as opposed to later. Finally, even if Caldwell's trial testimony were false, Foley did not establish a reasonable likelihood that this testimony could have affected the jury's judgment. Caldwell testified that Foley wanted him to implicate Danny Joe Bryant in Lynn Vaughn's death. Notably, this was different from what Foley testified at trial, when he blamed Lynn's death on Ronnie Dugger. In any event, several witnesses testified that Foley was the only armed person at the gathering, that Foley shot Rodney Vaughn, and that only Foley and Ronnie Dugger were in the house when Lynn Vaughn was shot. Ronnie Dugger testified that Foley shot Lynn, and several witnesses testified that Foley recruited them to help cover up the crimes. In short, Caldwell's trial testimony was not a crucial link in the case against Foley. Accordingly, the Kentucky Supreme Court's decision to reject Foley's *Giglio* claim was neither contrary to nor an unreasonable application of federal law as determined by the United States Supreme Court.

## VIII. Conclusion

We AFFIRM the district court's dismissal of each of petitioner's claims for habeas corpus relief.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

BOYCE F. MARTIN, JR., Circuit Judge, concurring in part and dissenting in part.

**A.**

My initial thoughts concern Part III of the majority's opinion. The Commonwealth argues, and the majority seems to agree, that the Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), is entirely inapplicable to Foley's habeas petition, because it was published well after the Kentucky Supreme Court ruled on his *Strickland* claim of ineffective assistance of counsel. *See* Maj. Op. at 3-4 ("[O]ur review will ignore interpretations of *Strickland* by the Supreme Court in cases such as . . . *Wiggins* . . . ."); D. Ct. Op. at 7 (holding that *Wiggins* "does not impact the analysis in [Foley's] case"). *Wiggins* must be disregarded, the majority contends, because the Supreme Court has instructed lower federal courts sitting in habeas that "clearly established Federal law" under 28 U.S.C. § 2254(d)(1) is "the governing legal principle or principles set forth by the Supreme Court *at the time the state court renders its decision*." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (emphasis added).

Because *Wiggins* only clarified *Strickland*, however, it in no way alters the "governing legal principles" set forth in that case, principles with which we are quite familiar. Thus there is no reason why we should not draw from *Wiggins*, as well as *Strickland*, in analyzing the instant case. Precisely this point was made by a recent panel of this circuit in *Slaughter v. Parker*, 450 F.3d 224 (6th Cir. 2006):

> A careful reading of *Wiggins* . . . reveals that the [Supreme] Court looked to *Strickland* while analyzing whether trial counsel performed an adequate investigation in preparing for the penalty phase of Wiggins's trial, which occurred in October of 1989. *See Hamblin* [*v. Mitchell*], 354 F.3d at 487 ("[t]he Court in *Wiggins* clearly holds . . . that it is not making 'new law' on the ineffective assistance of counsel either in *Wiggins* or in the earlier case on which it relied for its standards, *Williams v. Taylor* [ ]"). Hence, we may look to *Wiggins* to decide whether the Supreme Court of Kentucky unreasonably applied Supreme Court precedent.

450 F.3d at 233 n.2. The denial of Slaughter's ineffective assistance claims was affirmed by the Kentucky Supreme Court in April 1999, *id*. at 231, whereas the denial of Foley's ineffective assistance claims was affirmed by the Kentucky Supreme Court *after* Slaughter's, in March 2000. Maj. Op. at 2 (citing *Foley v. Commonwealth*, 17 S.W.3d 878 (Ky. 2000)). In light of *Slaughter*, therefore, it seems to me that we may properly look to *Wiggins* for guidance in this case, even under deferential AEDPA § 2254(d)(1) review.

The Kentucky Supreme Court found that because there was no evidence of Foley having a mental defect, and because much of the testimony presented at the Rule 11.42 hearing pointed not so much to mitigating factors but to Foley's propensity for violence, "[t]he decision of counsel not to conduct additional investigation into defendant's background in search of mitigating circumstances can be supported by reasonable professional judgment." *Foley*, 17 S.W.3d at 885. The district court, in denying Foley's federal habeas claims, buttressed the Kentucky court's decision by pointing out that counsel "actively engaged" Foley and his family regarding mitigation evidence, only to learn that it was "clear" Foley did not want his family to testify. D. Ct. Op. at 11.

This description blatantly overstates the level of investigation that counsel actually conducted. When asked during the Rule 11.42 hearing whether Foley had been reluctant to put on mitigation evidence, counsel responded: "Yeah, I think what he said was something to the effect that he didn't want to put his family through all that. That's my best recollection of it." Especially in light of the fact that Foley's mother *wanted* to testify at his trial and provide some potentially mitigating evidence, counsel's own testimony makes it far from "clear" that he was "actively engaged" in discussing the pros and cons of mitigation evidence with Foley, or that he pressed Foley further when Foley expressed some reluctance to have family members testify. I therefore cannot agree that the Kentucky Supreme Court reasonably applied the tenets of *Strickland* in concluding that Foley's counsel's performance was not deficient with respect to investigation of mitigation evidence. *See Wiggins*, 539 U.S. at 533 ("[S]trategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation. A decision not to investigate thus must be directly assessed for reasonableness in all the circumstances.") (citations and internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 689).

I concur in Part III, however, because I believe Foley's mitigation claim falters on *Strickland*'s second prong: prejudice. What distinguishes Foley's mitigation claim from others that have been much stronger is that even when given the opportunity to investigate thoroughly in preparation for the Rule 11.42 hearing, Foley's state *appellate* counsel was unable to obtain any decent mitigating evidence. For example, if there really were something to Foley's argument that the testimony of his mother would have shown that he had suffered life-altering head injuries, that he had mental problems, and that his violent grandfather had caused him to know nothing but violence, one would expect there to have been at least *some* independent corroboration of these inferences, from a doctor, from a psychologist, indeed from anyone that appellate counsel could have drummed up. *Cf. Wiggins*, 539 U.S. at 523-28 (presenting on collateral review evidence of severe abuse as a child, sexual torment and rape in foster care, and diminished mental capacities); *Williams v. Taylor*, 529 U.S. 362, 395 (2000) (presenting on collateral review extensive records graphically describing petitioner's "nightmarish" childhood); *Williams v. Anderson*, 460 F.3d 789, 804-05 (6th Cir. 2006) (presenting on collateral review evidence that petitioner's mother was an alcoholic who neglected and beat him, that petitioner was dependent on cocaine at the time of the murder, and that petitioner suffers from a severe personality disorder, as documented by a clinical psychologist). I therefore cannot conclude that the Kentucky Supreme Court's ultimate resolution of Foley's ineffective assistance claim was objectively unreasonable in light of *Strickland*.

**B.**

My above analysis of the *Strickland* performance prong is nothing new inasmuch as it follows from a prior panel's analysis in *Slaughter*. I concede, however, that this Court has been anything but consistent in its explication and application of 28 U.S.C. § 2254(d)(1) in habeas cases, in particular with respect to the use of Supreme Court (or circuit) precedent that post-dates a given state court ruling on the merits. Compare *Slaughter*, 450 F.3d at 233 n.2 (discussed above) with *Keith v. Mitchell*, 455 F.3d 662, 670 (6th Cir. 2006) (filed less than a month after *Slaughter*, yet concluding that in an appeal "governed by AEDPA's standard of review, only Supreme Court cases already issued at the time of the relevant state court decision can offer guidance regarding whether counsel's performance was ineffective"). Such uncertainty counsels in favor of en banc review of the issue, lest we unwittingly amass a grab bag of different points of departure under § 2254(d)(1). For judges to disagree about *how* a given precedent may apply to a petitioner's claim based on its factual similarity or dissimilarity is one thing; this is of course the very core of judicial reasoning. Yet for judges to disagree about *which* precedents may be used in the first instance, based not on their facts but on the exact date they were filed, is quite another.

I for one continue to believe that this Court's inflexible reading of § 2254(d)(1)'s unreasonable application prong "offends the judicial power under Article III." *Davis v. Straub*, 445 F.3d 908, 910 (6th Cir. 2006) (Martin, J., dissenting from denial of rehearing en banc). Some of my colleagues have similarly pointed out that to define Supreme Court precedent in its narrowest sense renders § 2254(d)(1) unconstitutional "by preventing our Court from giving our independent judgment on the legal effect of the evidence before us and by leaving us 'no adjudicatory function to perform.'" *Davis v. Straub*, 430 F.3d 281, 297 (6th Cir. 2005) (Merritt, J., dissenting) (quoting *United States v. Klein*, 80 U.S. 128, 146-47 (1871)). Today's majority cannot be said to have performed *no* adjudicatory function, for it of course has adjudicated Foley's ineffective assistance claim, and done so in convincing fashion, in light of *Strickland*. Yet by freezing in time the "governing legal principles"—i.e., the "clearly established Federal law"—before the Kentucky Supreme Court when it reviewed Foley's claims, and by robotically refusing to take guidance from any cases after this date (such as *Wiggins*), the majority greatly constricts this very function. There is a difference between cases that present *new* law and those that present *nuanced* law: our ability to make use of the former on collateral review may well be properly restricted by *Teague v. Lane*, 489 U.S. 288 (1989), whereas our ability to make use of the latter seems unconstitutionally restricted by an overly narrow reading of § 2254(d)(1).

The circuit courts, as well as the Supreme Court, seem to have put the cart before the horse by "tacitly assuming" the constitutionality of AEDPA in general and § 2254(d)(1) in particular. *Irons v. Carey*, — F.3d —, 2007 WL 656345, at *8 (9th Cir. March 6, 2007) (Noonan, J., concurring). And yet, as the Ninth Circuit has recently pointed out, it is this more fundamental question that deserves our attention, hopefully sooner rather than later:

> In our system of law where precedent prevails and is developed, AEDPA denies the judge the use of circuit precedent, denies development of Supreme Court and circuit precedent, denies the deference due the penumbra and emanations of precedent, and even denies the courts the power to follow the law as now determined by the Supreme Court—the precedent to be applied must have been in existence at the earlier moment when a state decision occurred. A more blinkered concept of law cannot be imagined—law, particularly constitutional law—is treated as what once was the law. The development of doctrine is despised. That despisal is a direct legislative interference in the independence of the judiciary.

*Id*. at *7; *see also id*. at *11 (Reinhardt, J., concurring) ("Having granted the courts the authority to review state convictions under our habeas powers, it seems to me inconsistent with our fundamental obligations as judges to require us, except in unusual or exceptional circumstances, to rule for the state regardless of whether it violated the Constitution. Such a mandate appears to me to tell us how to decide a case."). Should we continue to read § 2254(d)(1) so narrowly, so as to allow only snapshots of "what once was the law," or should we consider this provision more broadly, so as to allow us our rightful room to interpret the law within Article III? Much like some members of the Ninth Circuit have done, I would encourage my own colleagues to at least consider tackling this constitutional question.

### C.

I now turn to Parts V and VI of the majority opinion, with which I cannot similarly concur. In my mind, the analysis of Foley's motion for change of venue (discussed in Part V) and his motion to strike ten jurors for cause (discussed in Part VI) are fully interrelated, and thus I will discuss them together.

The majority is correct that *Irvin v. Dowd*, 366 U.S. 717 (1961), supplies the fulcrum by which we must judge the reasonability of the Kentucky Supreme Court's decision. In *Irvin*, the

Supreme Court reversed a state-issued death sentence on grounds that prejudicial pretrial publicity should have mandated a change of venue, not just to a county adjoining the county in which the murders had occurred, but to a county geographically far enough removed to be untainted by the publicity. The Court noted that:

> One of the rightful boasts of Western civilization is that the State has the burden of establishing guilt solely on the basis of evidence produced in court and under circumstances assuring an accused all the safeguards of a fair procedure. These rudimentary conditions for determining guilt are inevitably wanting if the jury which is to sit in judgment on a fellow human being comes to its task with its mind ineradicably poisoned against him.

366 U.S. at 729 (Frankfurter, J., concurring). To this broad premise, however, was added a qualification reflecting the reality of criminal trials in the modern era:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* at 722-23; *see also Patton v. Yount*, 467 U.S. 1025, 1036 (1984) (noting that the critical question is: "did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed[?]"). *Irvin* forces courts to engage in a balancing act, to be sure, but in Foley's case I cannot agree that the state courts' balancing was reasonable.

The state-court review of Foley's change of venue claim was highly contested, with three members of the Kentucky high court writing in dissent against a four-member majority. *See Foley*, 942 S.W.2d at 890-91. For example, the dissenters disagreed with the majority's gloss on the pre-trial media coverage, pointing out that "[n]ewspaper coverage between August of 1991 and the trial date was comprehensive and repetitive. The details of the murders were repeated over and over." *Id.* at 890. They also noted that Foley was the subject of several editorials in the local and regional newspapers, editorials which even the majority had conceded were inflammatory. Furthermore, the news at the time was flush with reports of *other crimes* that Foley had allegedly committed. Newspaper articles indicated that, but for deals with the government, Foley would have been serving jail time for other crimes at the time of the Vaughn murders—the implication being that had the government not brokered a plea deal with such an inveterate criminal, the Vaughn murders could have been avoided. Most damning for Foley, however, was the concomitant news reporting of the four *other* murders with which he was charged and for which state prosecutors were seeking the death penalty. These murders were even more violent and seemingly random than those of the Vaughn brothers, the bodies of the four victims having been hidden for several years in a septic tank and only discovered in 1991, the same year the bodies of the Vaughn brothers were found in Sinking Creek. In fact, Foley's motion for a change of venue as to this quadruple-murder trial was *granted*, and the trial was eventually held in Madison County in 1994, the year following his double-murder Laurel County trial.

In denying Foley's change of venue claim on federal habeas, the district court likened his situation to that of the petitioner in *DeLisle v. Rivers*, 161 F.3d 370 (6th Cir. 1998) (en banc), in which a majority of this Court rejected petitioner DeLisle's *Irvin*-based change of venue arguments. The *DeLisle* majority noted that because fewer than 15% of the jury venire had any fixed opinion about DeLisle's guilt, in contrast to the 90% in *Irvin*, that was too little for DeLisle to have properly received a change of venue on grounds of "presumed prejudice." *Id.* at 383. I respectfully must disagree with the district court's reliance on *DeLisle*.

First of all, Foley has a stronger claim of presumed prejudice than did DeLisle, because the Kentucky Supreme Court makes clear that at least 33% of the jury venire "either believed [Foley] was guilty or did not presume him to be innocent." To be sure, this is not the 90% in *Irvin*, but to have fully one-third of the jury venire so infected is by no means insubstantial. *Cf. Murphy v. Florida*, 421 U.S. 794, 803 (1975).

Secondly, and more importantly, Foley has a much stronger "actual prejudice" claim than did DeLisle, because Foley can actually point to the voir dire and show that ten jurors whom he asked the trial judge to strike for cause were retained. This fact is in stark contrast to that which we deemed critical in *DeLisle*: "[W]hat is of greatest importance [is that] *none* of those actually seated on DeLisle's jury was challenged for cause, and none expressed a fixed opinion about DeLisle's guilt." 161 F.3d at 383 (emphasis in original); *see also Nevers v. Killinger*, 169 F.3d 352, 367 (6th Cir. 1999) (rejecting petitioner's claim at least in part on grounds that only two jurors eventually seated were challenged for cause). Thus the record of voir dire in Foley's case becomes critical. *See Montgomery v. Commonwealth*, 819 S.W.2d 713, 716 (Ky. 1991) ("One of the substantial considerations in affirming the trial court on a change of venue issue is the trial judge's decision to permit a broad voir dire to identify prospective jurors so affected by pretrial publicity that they should be excused for cause."); *Nevers*, 169 F.3d at 363 (concluding that "pretrial publicity that would inherently prejudice the jury pool can be discerned only by reviewing both the extent and nature of the publicity *and* the responses of the prospective jurors in voir dire") (emphasis in original); *Murphy*, 421 U.S. at 803 (concluding that some bias on the part of the jury *venire* does not "impeach the indifference" of any *individual* jurors who "displayed no animus on their own").

Foley contends now, as he did on direct review before the Kentucky Supreme Court, that voir dire revealed implied bias in ten prospective jurors, all but one of whom were ultimately empaneled. The majority of the Kentucky high court compared Foley's case to that of *Skaggs v. Commonwealth*, 694 S.W.2d 672 (Ky. 1985), noting that the pretrial publicity in *Skaggs* was far more inflammatory than here, and still it was found to have dissipated over time and thus not to have been of great influence on prospective jurors. *Foley*, 942 S.W.2d at 884. The Kentucky Supreme Court majority indicated that it was being guided by the United States Supreme Court's decision in *Mu'Min v. Virginia*, 500 U.S. 415 (1991), in which the Court stated:

> [O]ur own cases have stressed the wide discretion granted to the trial court in conducting voir dire in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias. Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. The trial court, of course, does not impute his own perceptions to the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire.

500 U.S. at 427.

According to the state trial judge, all of the jurors were ultimately rehabilitated merely by saying that they would do their "human best" to base a verdict solely on evidence presented in open court. *Foley*, 942 S.W.2d at 882 n.2. This would seem to satisfy the requirement that they swear to be able to "set aside what they had heard about the case and decide it based upon the evidence presented in court." Maj. Op. at 11 (citing *Patton*, 467 U.S. at 1036). But *Patton* requires a juror challenged for cause to do more than simply swear his impartiality; rather, *Patton* requires that the trial court reasonably *believe* that juror's "protestation of impartiality." With this in mind, here is a sampling of what each of the ten jurors said on voir dire, as characterized by the Kentucky Supreme Court majority, not the dissent:

> **As to Juror A:** "When asked her feelings about the killings, *she related that she knew others who felt he was probably guilty and that she felt the same. . . .* She knew Appellant was accused of four other murders."
>
> **As to Juror B:** "He couldn't recollect if he had ever said that Appellant was guilty. He didn't think that he had made such a statement, but he could not say for sure."
>
> **As to Juror C:** "[She] heard people remark that the trial would have to be moved because many in Laurel County had already formed an opinion. She had read about the Vaughn killings two years ago and was aware that Appellant was charged with other killings."
>
> **As to Juror D:** "He knew that Appellant had been arrested for murder and was suspected of other killings. . . *[He] admitted under questioning from defense counsel that most of the people in the community at that time believed that Appellant had killed both Vaughn brothers*."
>
> **As to Juror E:** "[He] could remember rumors of bodies found in a septic tank."
>
> **As to Juror F:** "[He] recalled the [news]paper referring to Appellant as an FBI informant who had been suspected of a previous killing."
>
> **As to Juror G:** "[She] remembered reading that Appellant was an FBI informant. Upon direct questioning by defense counsel, *she stated that she was not sure if she could remove all information from her mind during the trial and deliberations*."
>
> **As to Juror H:** "She knew that Appellant was accused of killing four other persons and that four bodies were found in a septic tank."
>
> **As to Juror I:** "She could remember that there was something about the bodies of four people from Ohio being found in a septic tank."
>
> **As to Juror J (the eventual foreman):** "[Foley's] defense attorney not only had represented family members of Juror J but also had opposed his family in other matters. . . . *When questioned concerning whether Appellant had any obligation to produce evidence to prove himself innocent, Juror J stated that he wanted evidence from Appellant to prove his innocence*."

*Foley*, 942 S.W.2d at 882-83 n.2-11 (emphasis added).[1]

---

[1] Here I am quoting the words of the Kentucky Supreme Court, not the words of the jurors themselves.

Having reviewed these and other voir dire statements, the dissenters on the Kentucky Supreme Court concluded that not only had the trial court disregarded relevant United States Supreme Court precedent in not striking some of the jurors for cause, it has disregarded the Commonwealth's *own* precedents as well:

It makes no difference that the jurors claimed they could give the defendants a fair trial. As we held in *Pennington v. Commonwealth*, "[i]t is the probability of bias or prejudice that is determinative in ruling on a challenge for cause;" and in *Tayloe v. Commonwealth*, "the conditions were such that their connections would probably subconsciously affect their decision of the case adversely to the defendants"; and in *Marsch v. Commonwealth*, "their statements, given in response to leading questions, that they would disregard all previous information, opinions and relationships should not have been taken at face value." *Pennington*, *Tayloe*, and *Marsch* stand for the principle that objective bias renders a juror legally partial, despite his claim of impartiality.

*Id.* at 892 (internal citing references omitted).

This is exactly my point as well. Accordingly, I believe the district court gave short shrift to the actual, un-rehabilitated prejudice that many of Foley's jurors possessed. Foley's case is unique in that most of the *seated* jurors—not simply a majority of those on the venire—were aware not only of the circumstances surrounding the two murders on which they were to pass judgment, but also of the four other murders with which Foley was accused. In a small, rural county such as Laurel, it strains credulity to think that facts and rumors swirling about Foley's gruesome quadruple murder would not have significantly tainted his double-murder jury. *See Nebraska Press Assoc. v. Stuart*, 427 U.S. 539, 599 n.22 (noting that "the smaller the community, the more likely there will be a need for a change of venue . . . when a heinous crime is committed"). This was borne out by the number of potential jurors dismissed immediately from the venire, as well as by the voir dire statements of jurors whom Foley challenged for cause but who were ultimately seated by the trial judge. I cannot deem "reasonable" the Kentucky Supreme Court's contention that these jurors had been "rehabilitated" on voir dire.[2]

In sum, I believe that the state courts of Kentucky did not merely apply *Irvin* incorrectly in Foley's case; rather, they applied it unreasonably. Such unreasonable application of Supreme Court precedent mandates a grant of the writ on the intertwined change-of-venue and motion-to-strike issues. Accordingly, I respectfully dissent as to Parts V and VI of the majority opinion.

---

[2]The mere fact that there was a strong dissent in Foley's state appeal does not of course mean that the Kentucky Supreme Court majority was unreasonable in its application of *Irvin*. The dissenters do make several good points, however, and these points align with my own determination that the majority was unreasonable.