*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0185P (6th Cir.)
File Name: 04a0185p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

ARTHUR L. ARMSTRONG,
  *Petitioner-Appellant,*

  *v.*

No. 02-6374

JACK MORGAN, Warden,
  *Respondent-Appellee.*

———————

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 99-00265—William J. Haynes, Jr., District Judge.

Argued: December 4, 2003

Decided and Filed: June 18, 2004

Before: KENNEDY, MARTIN, and MOORE, Circuit
Judges.

———————

**COUNSEL**

**ARGUED:** C. Douglas Thoresen, FEDERAL PUBLIC
DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant.
David H. Findley, OFFICE OF THE ATTORNEY
GENERAL, Nashville, Tennessee, for Appellee.
**ON BRIEF:** C. Douglas Thoresen, FEDERAL PUBLIC
DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant.

David H. Findley, OFFICE OF THE ATTORNEY
GENERAL, Nashville, Tennessee, for Appellee.

———————

**OPINION**

———————

BOYCE F. MARTIN, JR., Circuit Judge. Arthur
Armstrong appeals the denial of his petition for a writ of
habeas corpus following his state court convictions for
robbery, rape, kidnaping and crimes against nature. For the
reasons stated below, we AFFIRM.

I.

Armstrong's convictions arise from his participation in the
abduction, rape and robbery of a young woman on the night
of February 11, 1977. The victim testified that she was
abducted by two men as she was exiting her vehicle. During
much of the overnight ordeal, the victim's eyes were taped,
but at times the tape loosened and she was able to see the
identity of her abductors. The victim alleged that one of her
abductors–later identified as Armstrong–had told her to call
him "Nate." The testimony at trial indicated that "Nate" was
one of Armstrong's nicknames. Upon her release the
following morning, the victim reported the incident to the
police. The victim identified Ronny Harris, Armstrong's co-
defendant, as one of the perpetrators. Harris later pleaded
guilty to abduction and robbery. The victim also made a
photographic identification of Armstrong as the second
abductor. Armstrong was indicted for armed robbery, rape,
kidnaping and two counts of crimes against nature.

At Armstrong's jury trial, identification was a hotly
contested issue. Specifically, Armstrong attempted to cast
doubt on the victim's identification because her initial
identification did not make reference to Armstrong's
prominent gold teeth and because her eyes were taped during

most of the ordeal. The trial testimony indicates that the defense attorney questioned the victim regarding the kind of adhesive that was used over her eyes and whether more than one strip of tape covered her eyes. Indeed, at one point the defense attorney referred to the tape covering the victim's eyes as a "mask."[1] Another factor used to cast doubt on the victim's identification of Armstrong was that Armstrong's co-defendant denied that Armstrong had any involvement in the crimes. Additionally, Earline Harris House, Harris's sister and Armstrong's girlfriend at the time, testified that Armstrong was with her on the night of the incident and that during this visit her brother, Harris, by himself, brought the victim to her house and took her into his bedroom. Harris essentially testified that Armstrong could have had no involvement in the crimes committed against the victim because Armstrong was never in the presence of the victim. The evidence at trial, however, also demonstrated that the victim's necklace and a tennis racket, which the perpetrators stole, were recovered from Armstrong's possession. The jury convicted Armstrong on every count contained in the indictment, and the conviction was affirmed on direct appeal.

In July 1989, Armstrong filed a petition for post-conviction relief with the state court, arguing that trial counsel was ineffective for not challenging the photographic lineup and for not filing any pretrial motions. This petition was denied and the Tennessee Court of Criminal Appeals affirmed. The Tennessee Supreme Court denied Armstrong's appeal. In June 1992, Armstrong filed a petition for habeas corpus relief in the district court, which held that Armstrong had failed to properly exhaust three out of his four claims for relief.

In April 1993, Armstrong filed a petition for state habeas corpus relief which was denied. According to Armstrong, on approximately August 27, 1993, his attorney discovered two

reports prepared by Officer Donzaleigh Heard on different dates in February 1977,[2] both of which contain statements indicating that the victim never had the opportunity to see her attackers clearly. Thus, Armstrong included in his appeal of the denial of his state petition for habeas corpus relief an allegation that the prosecution violated the disclosure requirements under *Brady v. Maryland*, 373 U.S. 83 (1963). The Tennessee Court of Criminal Appeals affirmed the denial, but noted that Armstrong's *Brady* violation claim should be presented in a state post-conviction proceeding. Thus, Armstrong filed for post-conviction relief with the state court in September 1995. After an evidentiary hearing, the state court denied Armstrong relief, crediting the testimony of the prosecutor at the original trial, David Raybin, that he had turned over all exculpatory evidence before Armstrong's trial. The Tennessee Court of Criminal Appeals affirmed and the Tennessee Supreme Court declined review.

In March 1999, Armstrong, proceeding without the benefit of counsel, filed a petition for a writ of habeas corpus with the district court. Counsel was appointed in March 2000. In June 2002, Armstrong sought leave to file an amended petition for habeas corpus relief, which was granted. It is the June 2002 petition that is at issue in the instant case. In this petition, Armstrong argues that the state court erred in concluding that no *Brady* violation occurred and that if the district court found that the exculpatory materials were presented to Armstrong's original counsel, then his trial attorneys were constitutionally ineffective. The district court, on September 30, 2002, granted summary judgment in favor of Warden Morgan concluding that Armstrong had procedurally defaulted his ineffective assistance of counsel claim and that the state court's factual determination that Raybin disclosed the reports to Armstrong's counsel was entitled to the statutory

---

[1]On the objection of the prosecution to the terminology of "mask," the reference was changed to "tape."

[2]Notably, the district court opinion erroneously stated that the supplemental report was dated "February 12, 1997." The actual date of the supplemental report was February 27, 1977.

presumption of correctness. *See* 28 U.S.C. § 2254(e)(1). This timely appeal followed.

## II.

Because Armstrong's petition for habeas corpus review was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, the Act governs this Court's review. *Bowling v. Parker*, 344 F.3d 487, 497 (6th Cir. 2003). Under the Act, this Court reviews "de novo the legal conclusions of a district court denying habeas relief." *Id.* This Court, however, presumes that the state court's factual determinations are correct, "unless [they are] rebutted by clear and convincing evidence." *Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003); 28 U.S.C. § 2254(e)(1). Pursuant to the Act, we may not grant a writ of habeas corpus unless we find that the state court's decision: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law . . ." or (2) "was based on an unreasonable determination of the facts . . . ." 28 U.S.C. § 2254(d)(1).

On appeal, Armstrong repeats his argument that the prosecution failed to disclose *Brady* material–i.e, two police reports containing material, exculpatory evidence. The first report, taken by Officer Heard, contains seven pages, but Armstrong claims to have received at the time of his trial only one page of this report. This report contains statements that the victim was blindfolded and never got a good look at her abductors and that they stayed behind her during the ordeal. The second report, also taken by Officer Heard, noted that the victim "did not get a good look at her assailants," and that having the victim "look at mug shots would have been useless." As discussed, Armstrong claims that he had not received these reports until 1993, when he requested a copy of his police file. We now analyze the merits of these very serious allegations of *Brady* violations.

*Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due

process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Supreme Court has since held that material, exculpatory evidence must be disclosed even absent the defendant's request. *See United States v. Agurs*, 427 U.S. 97 (1976). Evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). On appeal, the parties appear to agree that *Brady* required the disclosure of these reports.

A *Brady* violation, however, only occurs if the prosecution failed to disclose the evidence to the defense. The state court, after conducting an evidentiary hearing on the issue, determined that the evidence was indeed disclosed to defense counsel before Armstrong's trial. This decision was based upon the testimony of David Raybin, the original prosecutor in the case, who testified that he had disclosed this information to the defense. Upon review of Armstrong's federal petition for habeas corpus relief, the district court afforded the state court's finding on this ground the statutory presumption of correctness. *See Brown v. Davis*, 752 F.2d 1142, 1147 (6th Cir. 1985) ("factual findings of the state court are presumed to be correct" on federal habeas review).

On appeal, Armstrong argues that the district court erred in finding that he had failed to rebut by clear and convincing evidence the state court's factual determination that Raybin had provided Armstrong with the police reports. Alternatively, Armstrong argues that the district court erred in affording the state court's factual determination that Raybin had provided Armstrong with the police reports the statutory presumption of correctness.

We first address Armstrong's argument that the district court erred in finding that he had not rebutted by clear and convincing evidence the state court's factual determination that Raybin had provided Armstrong with the police reports.

In support of his argument, Armstrong points to: (1) the trial testimony of Officer Heard indicating that her only involvement in the investigation of the case was that she took the initial description and report from the victim, when there was evidence indicating that that was not, in fact, her only involvement in the investigation of the case because she wrote a supplemental report approximately two weeks after she took the initial description and wrote the first report; and (2) the 1989 testimony of Raybin indicating that there was only one piece of exculpatory evidence–"the sheet"–which Armstrong argues is inconsistent with Raybin's 1996 testimony that all exculpatory evidence was disclosed and also demonstrates that only one sheet of Officer Heard's report was given to the defense.[3] We find these arguments unpersuasive.

First, regardless of whether Officer Heard's testimony was arguably inconsistent with the facts surrounding her involvement in the case because there is evidence that she was more involved in the case than she testified to, this is not dispositive of the genuine issue involved on appeal –whether Armstrong provided clear and convincing evidence to rebut the state court's factual  determination that Raybin provided

---

[3]Armstrong also argues that there is evidence that Raybin misled the defense about the content of the police reports. Specifically, Armstrong contends that Raybin told defense counsel that he had a statement from the victim indicating that one of her abductors took off the tape on her eyes while she ate, so she was able to see clearly the abductor's identity, but that this statement was not mentioned in the reports. Armstrong argues that the absence of any notation in the police reports about this statement demonstrates that the prosecution engaged in a practice of withholding evidence from his defense. The attorney's full statement, however, was that he remembered Raybin telling him that "he had a statement - - or a least I remember him telling me . . . ." This full statement explains the absence of such a statement in the police report; that is, the testimony leaves open the possibility that Raybin did not actually have an official statement from the victim on this point. Moreover, while we reject the factual basis of this argument, we also note that it is of no legal consequence to Armstrong's *Brady* claim, as the statement was not withheld from the defense, nor exculpatory.

the defense with the exculpatory police reports.  Simply put, Officer Heard's testimony and indeed her credibility, is irrelevant to the issue of Raybin's credibility and whether or not he disclosed both of Officer Heard's police reports to the defense.

Second, at the 1989 hearing on Armstrong's ineffective assistance of counsel claim, Raybin essentially testified that there was only one piece of evidence that he felt constituted *Brady* material and that he had given the defense "the sheet." During this 1989 testimony, Raybin essentially testified that he knew the standard under *Brady* for evaluating whether information needed to be disclosed to the defense and that he acted consistently with his disclosure duties.  By viewing Raybin's testimony as a whole, one could argue that Raybin's testimony could be understood as an indication that he disclosed only the one sheet description of the perpetrators and nothing else, because he did not believe *Brady* required any more than that disclosure.

We conclude, however, that this testimony merely reflects Raybin's own assessment of the relevant weight of the evidence and not the amount of evidence that Rabyin disclosed to the defense.  Stated otherwise, even if Raybin believed that only one piece of evidence was exculpatory, that does not mean that he did not disclose more than that "one sheet."  Indeed, even Armstrong's own trial counsel testified that Raybin had provided "open file" discovery.  Thus, we do not believe that Raybin's 1989 testimony is inconsistent with his 1996 testimony.  In any event, even were we to conclude that Raybin's 1989 testimony was arguably inconsistent with his 1996 testimony, such an inconsistency would not constitute "clear and convincing" evidence to rebut the state court's determination that Raybin provided the defense with copies of the police reports in question.  Regardless of how we interpret Raybin's 1989 testimony and what implicit assumptions can be made from that testimony, in 1996 he testified clearly and directly that he gave the defense the police reports that Armstrong alleges were withheld.  Under

these circumstances, Armstrong has not met his burden of demonstrating clear and convincing evidence that the state court's factual determination was erroneous.

We next address Armstrong's alternative argument that the district court erred in applying the statutory presumption of correctness to the state court's factual determination that Raybin had disclosed the police reports at issue. Armstrong argues that because Raybin's 1996 testimony was inconsistent with his 1989 testimony and because the state court in making its finding did not have the benefit of analyzing and comparing Raybin's 1989 testimony with the 1996 testimony, the district court erred in relying upon the uninformed findings of the state court. Additionally, Armstrong argues that the state court's determination is not entitled to the statutory presumption of correctness because in making its finding it did not have the benefit of two medical reports containing notations that the victim's eyes were taped, thereby preventing her from seeing her abductors. Armstrong argues that these reports were withheld from the defense and discovered only after the state evidentiary hearing and that these reports impeach Raybin's testimony regarding the amount of exculpatory material. We find this argument unpersuasive.

First, as discussed, we cannot conclude that Raybin's 1996 testimony was inconsistent with his 1989 testimony. Second, given the fact that the same judge conducted both the 1989 and the 1996 evidentiary hearings and issued the accompanying orders, it is highly doubtful, contrary to Armstrong's assertion, that the "findings of the [state] court following the 1996 hearing would have been different" had it considered the inconsistency of Raybin's testimony. Finally, regarding Armstrong's argument that the medical reports impeach Raybin's credibility, we find no evidence to indicate that the medical reports were withheld during the initial trial. Rather, our review of the record indicates that the defense was fully aware of such reports; indeed, these reports were repeatedly referred to during the trial. *See* Joint Appendix

("J.A.") at 627 ("The staff hospital emergency room record was available to me . . . ."); J.A. at 628 (referring to the second report taken by the staff physician three hours after the initial report).

For the foregoing reasons, we AFFIRM the district court's denial of Armstrong's petition of a writ of habeas corpus.