# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 12, 2010 Session

## ARTHUR L. ARMSTRONG v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. C2854      J. Randall Wyatt, Jr., Judge**

---

**No. M2008-02328-CCA-R3-CO - Filed July 30, 2010**

---

The Petitioner, Arthur L. Armstrong, was convicted in 1978 of robbery, rape, kidnapping, and two counts of crime against nature and was sentenced to two life sentences, a twenty-year term, and two indeterminate terms of not less than ten years nor more than fifteen years, all of which the trial court ordered to be served consecutively. In March 2005, the Petitioner filed a petition for a writ of error coram nobis, in which he alleged newly discovered evidence, and the trial court dismissed the petition after a hearing. On appeal, he contends that the dismissal was an unconstitutional denial of his right to due process. After careful review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, delivered the opinion of the Court, in which DAVID H. WELLES, J., and FRANK G. CLEMENT, JR., Sp. J., joined.

Patrick G. Frogge, Nashville, Tennessee, for the appellant, Arthur L. Armstrong.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark A. Fulks and Clarence E. Lutz, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Amy Eisenbeck, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Background

In our opinion on the Petitioner's previous appeal, we recited the underlying facts and procedural history as follows:

This case presents a protracted procedural history. The facts underlying the convictions at issue in this case were summarized by this Court on direct appeal as follows:

[T]he victim was accosted by the [Petitioner] and Ronny Harris at about 11:00 o'clock on February 11, 1977, as she was getting out of her father's automobile which she had just parked at Fisk University in Nashville. At gunpoint, they took her to a room where the [Petitioner] raped her and Harris forced her to perform an oral sex act upon him, ejaculating in her mouth and forcing her at gunpoint to swallow the semen. Harris also raped her at this location.

They then took her to a large house where Harris left her with the [Petitioner] for a time. Pointing the pistol at her and threatening to kill her, the [Petitioner] forced her to perform oral sex on him, submit to anal intercourse two times and submit to normal sexual intercourse two times. While they were there, the [Petitioner] forced the victim to give him the .14 K[sic] gold star necklace which she was wearing.

The victim was then forced to go to an apartment complex where Earline Harris House resided with the defendant, Ronny Harris. Ms. House was the sister of Ronny Harris and the girlfriend of the [Petitioner]. The victim stated that she did not ask this woman for help because she was convinced that the woman already knew of the crimes being committed against her.

At gunpoint, Harris and the [Petitioner] took the victim's watch and rings, her father's tennis racket and other items of personal property worth approximately $3,000.00.

The victim was not released until the following morning. After being released, the victim reported the outrage to the police. She selected the [Petitioner's] photograph from one stack and Ronny Harris's photograph from another stack. After identifying a photograph of the [Petitioner], she noted that he was wearing the gold star necklace which he had taken from her at the large house. She identified other photographs of the [Petitioner] and made a positive identification of him at trial.

-2-

Though her eyes were taped a part of the time, she had limited vision because the tape became partly unstuck.

The victim's 14 k. [sic] gold star necklace and her father's tennis racket were recovered by police from the [Petitioner's] apartment. Other items of property taken from her were recovered from the apartment which Harris shared with Earline House. The victim testified that the abductor she identified as the [Petitioner] told her to call him "Nate." The [Petitioner] owned a T-shirt with the word "Nat" on it and it was established that this was one of his nicknames.

*Arthur L. Armstrong v. State*, No. C-2854, slip op. at 1-3 (Tenn. Crim. App., Nashville, Feb. 27, 1980).

On November 3, 1978, a Davidson County jury convicted the Petitioner of armed robbery, rape, kidnapping, and two counts of crime against nature. For these convictions, he received two life sentences for the rape and kidnapping, twenty years for the armed robbery, and two indeterminate terms of not less than ten years nor more than fifteen years for the crimes against nature. *Id.* at 1. All sentences were to be served consecutively. *Id.*

This Court affirmed the Petitioner's convictions and sentences on direct appeal. *See id.* at 7. In evaluating the sufficiency of the evidence to support the Petitioner's convictions, the court reasoned:

The [Petitioner] did not testify in his own behalf and his principal defense was that of identification. Among other things, he insists that the victim's identification evidence was invalidated by her failure to mention his two gold front teeth. This, and the other discrepancies alleged by the [Petitioner], went to the weight of the evidence for consideration of the jury along with all of the other proof in the case. After reviewing this voluminous record, we find overwhelming and convincing evidence upon which a rational trier of fact could be convinced beyond a reasonable doubt of the [Petitioner's] guilt.

*Id.* at 3-4. No permission to appeal was filed.

Nine years later, on October 18, 1989, the Petitioner filed a petition seeking post-conviction relief raising four allegations of ineffective assistance of counsel. The trial court denied relief. On appeal, the Petitioner argued that his trial counsel was ineffective for failing "to file pretrial motions to suppress the photographic show-up." *Arthur Armstrong v. State*, No. 01C019003CC00069, 1990 WL 160915, at *1 (Tenn. Crim. App., Nashville, Oct. 25, 1990). This Court affirmed the denial of relief, finding that the "decision not to contest the photographic identification" was "a reasonable tactical decision." *Id.* Our supreme court denied his application for permission to appeal on January 22, 1991.

In June of 1992, the Petitioner filed for habeas corpus relief in the Federal District Court for the Middle District of Tennessee. The petition was dismissed without a hearing because the Petitioner "had failed to properly exhaust three out of his four claims for relief." *Armstrong v. Morgan*, 372 F.3d 778, 780 (6th Cir. 2004); *see also Arthur L. Armstrong v. State*, No. 01C01-9311-CR-0043, 1994 WL 695424, at *1 (Tenn. Crim. App., Nashville, Dec. 8, 1994).

On April 21, 1993, the Petitioner "filed a pro se petition for a state writ of habeas corpus and a delayed appeal to the Supreme Court." *Armstrong*, 1994 WL 695424, at *1. The trial court dismissed the habeas corpus petition, finding that "the issues raised by [the Petitioner] were not grounds for habeas corpus relief, that if the petition were considered as one seeking post-conviction relief, it was time barred by the provisions of Tennessee Code Annotated Section 40-30-102, that the issues were either previously determined or waived, and that the trial court could not decide whether the Court of Criminal Appeals would hear a delayed appeal." *Id.*

The Petitioner appealed the dismissal of his petition to this Court and, for the first time, he alleged a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, the Petitioner alleged:

> [T]he police investigative file contains exculpatory evidence and that the prosecution withheld this material from defense counsel. [The Petitioner] further alleges that he was unaware of this exculpatory material until counsel discovered it shortly after the denial of his petition for a writ of habeas corpus. According to [the Petitioner's] brief, the exculpatory material is found in a police report in which the investigating officer wrote: "The

-4-

victim stated that she did not get a good look at her assailants, therefore, having her look at mug shots would be useless."

*Armstrong*, 1994 WL 695424, at *3.  This Court declined to address the Brady issue; however, we noted that, even though the statute of limitations had expired, the Petitioner could file a petition for post-conviction relief under the authority of *Burford v. State*, 845 S.W.2d 204 (Tenn. 1992).  In so concluding, we stated:

> [The Petitioner] alleges that the prosecution failed to disclose a police report that contained information relevant to the validity of his identification by the victim, and that the material was discovered only recently.  On its face, it appears that this is precisely the scenario that the Supreme Court was considering when it forged the rule in *Burford*.

*Armstrong*, 1994 WL 695424, at * 3.

The Petitioner then "filed a pleading entitled 'Amended Petition for Post-Conviction Relief' asserting that the case had been remanded to the trial court."  *Arthur L. Armstrong*, No. 01C01-9608-CR-00331, 1997 WL 602939, at *1 (Tenn. Crim. App., Nashville, Sept. 30, 1997).  Even though the Petitioner was mistaken about remand on the *Brady* issue, the trial court held an evidentiary hearing and dismissed the petition.  *Id.*  On appeal, this Court noted the following facts relevant to the issue:

> The issue regarding *Brady* material involved two (2) police reports which Petitioner claimed were exculpatory and were not provided to him by the State.  It is apparent from the record that Petitioner's two attorneys at the original trial were both deceased by the time the present petition was heard in the trial court.  However, an attorney in Nashville who formerly was an Assistant District Attorney in Davidson County and who prosecuted the Petitioner's case testified at this most recent hearing.  He stated the reports were provided to defense counsel prior to trial.  The trial court specifically accredited the testimony of the former prosecutor, and found that the police reports were indeed provided to Petitioner's attorneys prior to his trial in 1978.

-5-

At the evidentiary hearing, the Petitioner also alleged that his trial counsel was ineffective for not attacking the credibility of the victim, not appealing the apparent Brady violation, and not providing the police reports to the Petitioner. The trial court found that all of these issues were either previously raised in a prior post-conviction hearing, had no merit because no Brady violation was found, or failed to show prejudice to Petitioner by any alleged ineffective acts of his trial counsel.

*Id.* at *1-2. We then concluded that "the evidence does not preponderate against the finding of the trial court." *Id.* at *2. On April 13, 1998, permission to appeal was denied.

In March of 1999, the Petitioner again filed for habeas corpus relief in the Federal District Court for the Middle District of Tennessee. *Armstrong*, 372 F.3d at 780. In June 2002, the Petitioner sought leave to amend the petition, which was granted. *Id.* In the amended petition, the Petitioner argued that "the state court erred in concluding that no Brady violation occurred and that if the district court found that the exculpatory materials were presented to [the Petitioner' s] original counsel, then his trial attorneys were constitutionally ineffective." *Id.* On September 30, 2002, the district court "granted summary judgment in favor of Warden Morgan concluding that [the Petitioner] had procedurally defaulted his ineffective assistance of counsel claim and that the state court's factual determination that [then Assistant District Attorney] Raybin disclosed the reports to [the Petitioner's] counsel was entitled to the statutory presumption of correctness." *Id.* at 780-81. The United States Court of Appeals for the Sixth Circuit affirmed, *id.* at 783, and the United States Supreme Court denied certiorari on November 8, 2004, *Armstrong v. Morgan*, 543 U.S. 982 (2004).

On March 10, 2005, the Petitioner, pro se, filed an "Application for a Writ of Error Coram Nobis." The Petitioner again claimed that the State failed to disclose Brady material, i.e., two medical documents. In the first document, Physical Examination Progress Notes, it is noted that the victim's "eyes were taped so she could not see the men." In the second document, the Emergency Room Record, it is stated that the victim's "eyes were taped, and she never saw them." (Emphasis in original). The Petitioner submitted that defense counsel made a specific request for exculpatory evidence, and the State withheld the exculpatory medical documents in violation of *Brady v. Maryland*. The Petitioner further stated that the documents were subsequently discovered

"while conducting investigation for appellate proceedings." As an alternative argument, the Petitioner contended that, if the documents were presented to his trial counsel, then trial counsel rendered ineffective assistance by failing to impeach the victim with the statements contained in the medical documents. By order dated April 12, 2005, the trial court determined that the Petitioner failed to file his petition within the one-year statute of limitations and failed to demonstrate that due process required tolling of the statute of limitations.

*Arthur L. Armstrong v. State*, No. M2005-01325–CCA-R3-CD, 2006 WL 1626726, at *1-4 (Tenn. Crim. App., at Nashville, June 8, 2006) (footnote omitted). The Petitioner appealed the trial court's dismissal of his petition for writ of error coram nobis to this Court. Upon review, this Court concluded that if the evidence proved "the State [had] withheld the evidence, the Petitioner's 'allegations of newly discovered evidence are appropriately addressed in a petition for writ of error coram nobis[.]'" *Id.* at *8 (citing *Freshwater v. State*, 160 S.W.3d 548, 555-56 (Tenn. Crim. App. 2004)). We remanded the case for an evidentiary hearing on the Petitioner's claim of newly discovered evidence, and we affirmed the trial court's dismissal of the Petitioner's allegation of ineffective assistance of counsel.

### B. Hearing on Petition for Writ of Error Coram Nobis

After our remand, the State filed a motion to dismiss the petition for writ of error coram nobis as untimely. The trial court held a hearing where both the Petitioner and the prosecuting attorney at the Petitioner's trial testified. Neither of the Petitioner's defense attorneys were available to testify as both had passed away by the time of the hearing. At that hearing, the Petitioner testified that, at the time of the hearing, he had been in prison for thirty-one years based upon his convictions for armed robbery, kidnapping, rape, and crimes against nature. His defense attorneys were Dan Garfinkle and Bill Wilson and the prosecutors were David Raybin and Harold McDonough. The Petitioner described himself as actively involved in his defense, saying that he was first represented by Pat Kennedy but that, two weeks before trial, he retained Garfinkle. On the day of trial, Garfinkle arrived with Wilson and informed the Petitioner that Wilson would be assisting with the trial.

The Petitioner[1] testified about allegedly discovering the existence of medical reports

---

[1]Both the Petitioner and the prosecuting attorney, Raybin, testified about the police reports created by Detective Donzaleigh Heard, which the Petitioner said he was not given before trial. The Petitioner previously filed a petition for post-conviction relief alleging that the State withheld these two police reports, violating *Brady*. *Armstrong*, 1997 WL 602939, at *1. The post-conviction court held a hearing and dismissed the petition, finding that Raybin was credible when he testified that the police reports were indeed provided to the Petitioner's attorneys prior to his trial in 1978. This Court affirmed that dismissal. *Id.* at *2.

(continued...)

that he contended were exculpatory. He said he filed a federal habeas corpus petition in the United States District Court. The habeas court appointed him federal counsel, who hired an investigator, and the investigator discovered the existence of two medical reports from General Hospital, where the victim had been treated. The first report stated that the victim told hospital personnel that she never saw "them," meaning her assailants. The second document was authored by medical examiner Dr. Simpkins, who testified at the trial that the victim stated that she had not been hit, scratched, or cut during the attack and that her eyes were taped so she could not see the men. The Petitioner said his federal habeas corpus counsel amended his habeas petition when he learned of the existence of these documents. He said none of his previous attorneys had shown him these medical reports.

The Petitioner said that his trial counsel, Garfinkle, testified at the 1989 post-conviction hearing that he had destroyed the Petitioner's original file ten years after the trial.

On cross-examination, the Petitioner testified that defense counsel at his original trial called Earlene Harris House, with whom he had "social ties," as an alibi witness. House testified at trial that the Petitioner was at her house when House's brother brought the victim through the door. House also testified that the victim's necklace was left at her house. The Petitioner agreed that House testified that the victim in this case did not appear to have been through any type of "ordeal" and did not mention that the victim's eyes were taped shut. The Petitioner agreed that House's testimony contradicted the victim's statement that her eyes were taped shut. The Petitioner maintained that he had not been given the medical records as part of discovery and did not learn of their existence until after his first post-conviction hearing.

On redirect examination, the Petitioner identified the transcript of his 1989 post-conviction hearing and testified no mention was made in that hearing of either of the medical reports. The Petitioner then identified a transcript from his 1996 post-conviction hearing and testified that these transcripts, too, did not contain a reference to the medical reports. The Petitioner believed no one referred to the medical reports in these hearings because the State never produced the medical reports to his post-conviction attorney. The Petitioner next identified a transcript from his original trial and noted that it, too, made no reference to the medical reports.

The Petitioner testified that, at his 1996 post-conviction hearing, he learned the lawyers and the trial judge had held an ex parte meeting without him present. He said he

[1](...continued)
Therefore, we will not discuss or recount the testimony offered at the present evidentiary hearing about those police reports.

never received a transcript, recording, or any other documentation about that meeting. He later learned that the subject of this meeting was discovery and the complete disclosure by the district attorney of all documentation in this case.

David Raybin, the assistant district attorney who prosecuted the Petitioner, testified he worked as a prosecutor for seven years before entering private practice. Raybin testified that the Petitioner's two attorneys at his pre-trial and trial proceedings, Wilson and Garfinkle, were both highly experienced criminal defense attorneys who had since passed away. Raybin testified he provided "open-file" discovery in this case due to the gravity of the charges and the amount of evidence that the State had against the Petitioner, in hopes that the Petitioner would plead guilty. Raybin said he also provided his entire file to the defense as the trial drew near because he wanted to file a discovery request in order to ascertain how the Petitioner intended to defend the case. To that end, Raybin invited the defense attorney to his office, gave the defense attorney a copy of every paper in the file, and allowed him to view the physical evidence. Raybin clarified that the Petitioner was also a suspect in fourteen or fifteen other rape cases, but he did not give the Petitioner's attorney a copy of the documents involving those investigations, but gave him copies of all of the documents pertinent to the rape charge involved in this case. Raybin testified that the Petitioner's defense attorney, Garfinkle, testified at the Petitioner's 1989 post-conviction hearing that Raybin had offered Garfinkle "open-file" discovery in this case.

Raybin testified that at the Petitioner's trial Dr. Simpkins, who was "sort of the medical examiner" at the time, testified that he had familiarized himself with the reports of the emergency room doctors before he examined the victim. Raybin said he never would have allowed the doctor to testify about records that the State had not disclosed to the defense. Raybin explained that under the rules of discovery, he was obligated to provide the medical records to the defense before he was allowed to put on an expert witness, reiterating that this decision was not within his discretion but was mandatory. Raybin said he never would have held back exculpatory evidence.

Raybin agreed that the Petitioner's identity was an important factor in this case and that the victim's testimony was an integral part of proving that factor. He said, however, that additional evidence proved the Petitioner's identity: the tennis racket stolen from the victim's car was found in a search of the Petitioner's possessions; the victim's rapists took from her a star necklace, which the Petitioner later wore in a mug shot taken as a result of his arrest on an unrelated gun charge; and the police recovered the star worn by the Petitioner, and the victim identified it.

Raybin said he examined his file from the Petitioner's case in preparation for this hearing. In it, he found multiple copies of the medical reports, and he explained that the

copies were there because he provided a copy to the defense.

On cross-examination, Raybin agreed the Petitioner's case was one of his first trials, and it was a very important case to him. Raybin agreed that there were documents related to this case that were not in his file because they were maintained by the police department or another agency. Raybin said he was aware of one report by Detective Heard that he failed to provide through open-file discovery, explaining he was unaware of the document that was maintained by the police department. Before the trial, the defense requested this document, the trial judge admonished Raybin for not providing it, Raybin retrieved it from the police, and Raybin then provided it to the Petitioner's defense attorneys. As to the meeting wherein the trial judge admonished him, Raybin testified that the Petitioner's defense attorneys were present but a court reporter was not.

Raybin was asked to speculate why the Petitioner's defense attorneys, who were very good attorneys, would not have impeached the victim with Detective Heard's report that the victim said she could not see her assailant. Raybin explained that the Petitioner's defense was based upon Ms. House's testimony that the victim was with the Petitioner's co-defendant willingly. Ms. House testified that she saw the victim at her house with the co-defendant and nothing seemed abnormal. Raybin recalled that Ms. House was a good witness who had no prior criminal convictions and whom he could not impeach. He speculated, therefore, that the defense attorneys did not cross-examine the victim about her inability to identify her attacker because it would have seemed inconsistent with their defense that the victim was a willing participant.

Raybin went on to explain that the defense team introduced a picture of the Petitioner's brother, who looked very much like the Petitioner. Raybin opined that the defense team wanted to commit the victim to her identification of the Petitioner and then show how similarly the Petitioner looked to his brother and allege that it was the Petitioner's brother who was involved in this rape and kidnapping and not the Petitioner.

Raybin specifically recalled obtaining the victim's medical records in this case from General Hospital, and he identified a letter by which he did so. Those documents were part of his file that he copied and gave to the Petitioner's defense attorneys.

On redirect examination, Raybin testified that both of the medical documents the Petitioner alleged were undisclosed were in his original file in a folder titled "Dr. Simpkins/medical."

## II. Analysis

-10-

A writ of error coram nobis is available to a defendant in a criminal prosecution. T.C.A. § 40-26-105(a) (2006). The decision to grant or to deny a petition for the writ of error coram nobis on its merits rests within the sound discretion of the trial court. *State v. Ricky Harris*, 301 S.W.3d 141, 144 (Tenn. 2010) (hereinafter "*Harris II*") (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999); *State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). As previously noted by our Court, "the purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1996)).

To establish that he is entitled to a new trial, the Petitioner must show: (a) the grounds and the nature of the newly discovered evidence, (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial, (c) that the Petitioner was without fault in failing to present the newly discovered evidence at the appropriate time, and (d) the relief sought. *Hart*, 911 S.W.2d at 374-75. Affidavits should be filed in support of the petition or at some point in time prior to the hearing. *Id.* at 375.

> The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. Coram nobis claims therefore are singularly fact-intensive. Unlike motions to reopen, coram nobis claims are not easily resolved on the face of the petition and often require a hearing.

*Harris v. State*, 102 S.W.3d 587, 592-93 (Tenn. 2003) (hereinafter "*Harris I*").

The statute of limitations for seeking a writ of error coram nobis is one year from the date the judgment becomes final in the trial court. T.C.A. § 27-7-103; *Harris II*, 301 S.W.3d at 144; *Mixon*, 983 S.W.2d at 671. The statute of limitations is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion. *Harris II*, 301 S.W.3d at 144 (citing *Mixon*, 983 S.W.2d at 670). Whether a claim is barred by an applicable statute of limitations is a question of law, which we review de novo. *Id.* (citing *Brown v. Erachem Comilog, Inc.*, 231 S.W.3d 918, 921 (Tenn. 2007)). We construe the coram nobis statute of limitations consistently with the longstanding rule that persons seeking relief under the writ must exercise due diligence in presenting the claim. *Id.* (citing *Mixon*, 983 S.W.2d at 670). The State bears the burden of raising the bar of the statute of limitations as an affirmative defense. *Id.* (citing *Harris I*, 102 S.W.3d at 593).

In this case, the Petitioner was convicted by a jury in November of 1978. This Court affirmed the convictions on February 27, 1980. The Petitioner filed the petition for writ of error coram nobis that is the subject of this appeal on March 10, 2005. The parties do not dispute that the statute of limitations, if not tolled, expired many years before the filing of the instant petition.

In this case, the State appropriately raised the statute of limitations in the trial court. The trial court originally ruled that the petition was time-barred and dismissed the petition. On appeal, this Court concluded that if the evidence proved "the State [had] withheld the evidence, the Petitioner's 'allegations of newly discovered evidence are appropriately addressed in a petition for writ of error coram nobis[.]'" *Arthur L. Armstrong v. State*, 2006 WL 1626726, at *8. We remanded the case for an evidentiary hearing on the Petitioner's claim of newly discovered evidence. At the evidentiary hearing, the State again contended that due process considerations did not require the tolling of the statute of limitations and also that the petition should be dismissed on its merits.

The Petitioner contends in his reply brief that his petition was timely filed because this Court specifically held that the statute of limitations was waived in its remand order. The landscape of the law on a writ of error coram nobis has changed, however, since we reversed this case for a hearing to determine the validity of the Petitioner's claims of newly discovered evidence. We will, therefore, first address whether due process considerations require a tolling of the statute of limitations before we address the issues contained in the petition on their merits.

Since our decision in the Petitioner's first appeal, the Tennessee Supreme Court released a case we find instructive, *Harris v. State*, 301 S.W.3d 141 (Tenn. 2010) (hereinafter

"*Harris II*"). In *Harris II*, the Court noted that, when a petitioner seeks a writ of error coram nobis based on newly discovered evidence of actual innocence, due process considerations *may* require tolling of the statute of limitations. *Id.* at 145 (emphasis added) (citing *Workman*, 41 S.W.3d at 101). These due process considerations are based upon the principle that "before a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." *Id.* (citing *Burford v. State*, 845 S.W.2d 204, 208 (Tenn. 1992)). Whether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness. *Id.* (citing *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006)).

The *Harris II* decision instructs that, in order to determine whether due process requires tolling, a court must weigh a petitioner's interest in obtaining a hearing to present a later-arising ground for relief against the State's interest in preventing stale and groundless claims. *Harris II*, 301 S.W.3d at 145 (citing *Workman*, 41 S.W.3d at 103). In balancing these interests, a court should utilize a three-step analysis:

> (1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

*Id.* (quoting *Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995)).

In conducting the first part of this three-part analysis in this case, we have judicially noticed the record from the Petitioner's first direct appeal, which was contained in our archives, and that record evinces that the trial court overruled the Petitioner's motion for new trial on February 15, 1979. Therefore, the limitations period normally would have begun to run on March 17, 1979, thirty days after the trial court denied the Petitioner's motion for new trial. The statue of limitations would have expired on March 18, 1980, almost twenty-five years before the Petitioner filed his first petition for writ of error coram nobis in 2005.

The second step in the analysis requires a determination of whether the Petitioner's grounds for relief, the alleged non-disclosure of medical records, arose after the limitations period normally would have commenced. As in *Harris II*, the factual allegations relevant to whether these grounds are later-arising are subject to considerable dispute. *Harris II*, 314 S.W.3d at 145 (citing *Harris I*, 102 S.W.3d at 596 (observing that the factual allegations

relevant to the tolling issue were subject to considerable dispute) (Holder, J., concurring)). In fact, the State contends that the disputed evidence was in the Petitioner's defense attorney's possession and that they did not use the evidence for strategic reasons. The Supreme Court in *Harris II* stated, however, that "[i]f tolling depended only on whether the grounds were later-arising, we would agree with the Court of Criminal Appeals that an evidentiary hearing would be necessary to resolve the issue." *Id.* at 145-46 (noting that the *Harris I* Court was divided about whether Harris presented a "later-arising" claim). For the sake of thoroughness, we will assume that the Petitioner's claim herein is "later-arising" and move on to the third part of the analysis.

The third step in the analysis requires a determination of whether the Petitioner was given a reasonable opportunity to present his claims. The Tennessee Supreme Court has addressed this issue on three prior occasions. Most recently, in *Harris II*, the Court concluded that due process did not require a tolling of the statute of limitations where a petitioner's delay is "unreasonable under the circumstances of the case":

> The time within which Mr. Harris filed his petition for writ of error coram nobis exceeds the reasonable opportunity afforded by due process. Mr. Harris's delay in seeking coram nobis relief–six years with respect to the alibi evidence and twenty-one months with respect to the third-party confession–is unreasonable under the circumstances of this case.

*Harris II*, 301 S.W.3d at 147.

Similarly, in *Workman*, a capital murder case, the petition for writ of error coram nobis was filed approximately thirteen months after the petitioner obtained the evidence at issue. The Court concluded that the time within which the petition was filed did not exceed the reasonable opportunity afforded by due process and, thus, tolled the statute of limitations for the petitioner. *Workman*, 41 S.W.3d at 103. In *Sample v. State*, 82 S.W.3d 267 (Tenn. 2002), our highest Court dealt with this issue in the context of a post-conviction capital case and declined to hold that the petitioner's delay of sixteen months after he obtained the evidence at issue was "in and of itself unreasonable." *Id.* at 276.

Turning to address the reasonableness of the delay in this case, we note that on March 3, 2009, the Petitioner filed an affidavit in support of his petition for writ of error coram nobis. In that affidavit, the Petitioner swore that he filed a habeas corpus petition in the United States District Court in 1999. In his original affidavit dated August 22, 2006, which supported his original writ of error coram nobis, the Petitioner swore that his appointed counsel's investigator, Ms. King, discovered the two medical reports in response to a discovery request filed June 23, 2000. In 2002, the Petitioner amended his petition to include

-14-

those two reports. The Petitioner did not file his petition for a writ of error coram nobis until 2005, at least three years after he allegedly discovered the existence of the medical reports. We could conclude then that the Petitioner's delay in seeking coram nobis appears, on its face, to be unreasonable under the circumstances of this case.

Our analysis, however, does not end here. The *Harris II* Court clearly stated that the *Harris II* case presented "an opportunity to clarify when delay in seeking coram nobis relief may be unreasonable as a matter of law, keeping in mind that each case must stand on its own facts." *Harris II*, 301 S.W.3d at 146. Further, the Court stated in a footnote that "[i]f there is a reasonable doubt as to the applicability of the procedural bar and the surrounding circumstances are not adequately developed, prudence may warrant an evidentiary hearing." *Id.* at n.3.

The Petitioner's case was pending in federal court on a federal habeas corpus petition when he says he "discovered" the existence of the medical reports. While he could have simultaneously filed a petition for a writ of error coram nobis, he swore in his affidavit supporting his original writ of error coram nobis,"On my attorney's advice I was told that I had to wait until the federal courts had ruled on the matter before it already, or the Petition for Habeas Corpus would be dismissed." The Sixth Circuit Court of Appeals decision on the Petitioner's federal habeas corpus petition indicates that he filed his federal habeas corpus petition in March 1999 and amended the petition in 2002 to include *Brady* allegations based upon the two police reports and the two medical reports. *Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir. 2004). The Sixth Circuit concluded that the Petitioner had not proven that the State suppressed either the two police reports *or* the two medical reports. Addressing the two medical reports, the Sixth Circuit stated:

> [W]e find no evidence to indicate that the medical reports were withheld during the initial trial. Rather, our review of the record indicates that the defense was fully aware of such reports; indeed, these reports were repeatedly referred to during the trial. *See* Joint Appendix ("J.A.") at 6127 ("The staff hospital emergency room record was available to me . . . ."); J.A. at 628 (referring to the second report taken by the staff physician three hours after the initial report).

Therefore, in light of our Supreme Court's recent decision in *Harris II*, the findings of the Sixth Circuit, and our own review of the record from the Petitioner's initial trial and record on appeal, we refrain from tolling the statute of limitations in this case. That being said, however, an evidentiary hearing took place and is part of the record in this case. Therefore, in the interest of justice and in the event of further review, we will examine the Petitioner's claim on its merits.

Under *Brady v. Maryland*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87. Evidence that is favorable to an accused includes proof which may be used to impeach the prosecution's witnesses. *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998) (citing *Giglio v. United States*, 405 U.S. 150 (1972)). However, "the evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Thus, a criminal defendant must satisfy the following four prerequisites in order to demonstrate a due process violation under *Brady v. Maryland*:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant has the burden of proving a *Brady* violation by a preponderance of the evidence. *Id.* "The key to proving a constitutional violation is to show that the omission is of such significance as to deny the defendant the right to a fair trial." *Id.*

The Petitioner has not met his burden of proving a *Brady* violation because he has not shown, by a preponderance of the evidence, that the State suppressed the two medical reports at issue. The Petitioner testified at the evidentiary hearing that an investigator hired by the attorney appointed to represent him in his federal habeas corpus petition discovered the existence of two medical reports from General Hospital. The Petitioner said none of his previous attorneys had shown him these medical reports. He conceded, however, that his trial attorney had previously testified that he destroyed his copy of the Petitioner's file.

Raybin, who prosecuted the Petitioner, testified that he personally wrote a letter to General Hospital requesting all the victim's medical records, and he identified a copy of that letter at the evidentiary hearing. Raybin stated he located in his file from the Petitioner's trial, under a sub-folder titled "Dr. Simpkins/medical," copies of both of the medical reports

the Petitioner complained he never received. He explained that the folder contained copies because he gave a copy to the Petitioner's defense attorneys as part of his open file discovery. Raybin expressed certainty that he provided the defense team a copy of these two medical records. He opined that the Petitioner's defense attorneys did not cross-examine the victim about this evidence because their theory of defense was based upon House's testimony that the victim was with the Petitioner's co-defendant willingly and did not seem in distress. Raybin also stated that the defense team introduced a photograph of the Petitioner's brother, who closely resembled the Petitioner, in support of a secondary theory that the victim saw the Petitioner's brother and not the Petitioner himself. Further, as the Sixth Circuit noted when it reviewed this case, there was mention at the Petitioner's original trial about these two medical reports. We conclude, as did the trial court, that this testimony does not support the Petitioner's assertion that the State suppressed the two medical reports at issue. He has not, therefore, proven a *Brady* violation. As such, he is not entitled to relief pursuant to a writ of error coram nobis.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the Petitioner has not proven that the State suppressed evidence in violation of *Brady*, and, therefore, the Petitioner is not entitled to relief pursuant to a writ of error coram nobis.

_____
ROBERT W. WEDEMEYER, JUDGE